**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard Lane BANGERT, and Alan Harold Kandel, Defendants-Appellants.**

**No. 80–1276.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 12, 1980.

Decided April 1, 1981.

Rehearing and Rehearing En Banc
Denied May 11, 1981.

Allen I. Harris and Lawrence P. Katzenstein, St. Louis, Mo., for defendants-appellants.

Robert D. Kingsland, U. S. Atty., Edward L. Dowd, Jr., Asst. U. S. Atty., St. Louis, Mo., for plaintiff-appellee.

Before HENLEY, McMILLIAN, Circuit Judges, and BECKER, Senior District Judge.*

WILLIAM H. BECKER, Senior District Judge.

Appellant Richard Lane Bangert (Bangert) appeals from judgments of conviction and sentences based on jury verdicts finding Bangert guilty, as charged in Count I, of violating § 641, Title 18 U.S.C. (stealing government property valued at less than one hundred dollars), and guilty, as charged in Count II, of violating § 1361, Title 18 U.S.C. (destruction of government property valued at less than one hundred dollars).

On Count I, Bangert was sentenced by the court to imprisonment for six months and a fine of one thousand dollars was imposed. On Count II, Bangert was sentenced to imprisonment for one year and a fine of one thousand dollars was imposed. Bangert was ordered to serve these two sentences of imprisonment consecutively.

Appellant Alan Harold Kandel (Kandel) appeals from a judgment of conviction and sentence based on a jury verdict finding him guilty, as charged in Count II only, of violating § 1361, Title 18 U.S.C. (destruction of government property valued at less than one hundred dollars). On Count II, Kandel was sentenced by the court to imprisonment for one year and a fine of one thousand dollars was imposed.

The appellants were charged in a single indictment, and tried jointly on Count II.

### The Assignments of Error of Appellant Bangert

Appellant Bangert contends that the district court erred: (1) in allowing the witnesses to identify Bangert in court at trial, contending that the earlier out-of-court identification procedures used by the Federal Bureau of Investigation (FBI) before indictment were impermissibly suggestive, causing the in-court identifications of him to be tainted by the earlier out-of-court identification of him from a display of photographs; (2) in not granting the motion of Bangert for a directed verdict, contending that the evidence was insufficient to sustain a verdict of guilty on Count II of the indictment; (3) in not granting a mistrial or continuance because of the contention of both defendants that they were greatly prejudiced by publicity unconnected with the defendants that inflamed the nation and the jury panel; (4) in abusing its discretion by imposing excessive sentences; (5) in sentencing Bangert to two terms of imprisonment to run consecutively; and (6) imposing the sentences of such severity for political acts that exercise of basic constitutional rights was chilled and others deterred from taking political stands opposing policies of the government.

### The Assignments of Error of Appellant Kandel

Appellant Kandel contends that the district court erred: (1) in not granting the motion of Kandel for a directed verdict, contending that the evidence was insufficient to sustain a verdict of guilty on Count II of the indictment; (2) in not granting a mistrial or a continuance because of the defendants' contentions that they were greatly prejudiced by publicity unconnected with the defendants that inflamed the nation and the jury panel; (3) in abusing its discretion by imposing an excessive sentence; and (4) when imposing sentence, in considering impermissible criteria, which infringed upon Kandel's basic constitutional rights as claimed by Bangert above.

For the reasons stated hereinafter, we affirm the judgments and sentences of the district court.

* The Honorable William H. Becker, United States Senior District Judge for the Western District of Missouri, sitting by designation.

*The Factual Background Shown by the Evidence*

In the following discussions the evidence and reasonable inferences therefrom are reviewed in the light most favorable to the prosecution, in accordance with the principles enunciated in *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *United States v. Berry* (C.A.8 1979) 599 F.2d 267, *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979).

On November 27, 1979, at approximately 7:50 A.M., a United States flag was stolen from the flagpole of the Federal Building at 1520 Market Street in St. Louis. (Tr. 70). The flag was replaced with a banner on which appeared a slogan that read "U. S. Keep Your Bloody Hands Off Iran." (Tr. 70). Approximately four hours later a United States flag was burned at a demonstration on the campus of Washington University, in which Bangert and Kandel participated. (Tr. 168, 254, 285). Apparently, the purpose of the demonstration was to protest involvement of the United States in the internal affairs of Iran. (Tr. 261, 293–294). Banners, with the same slogan that appeared on the banner that replaced the United States flag taken from the Federal Building, were displayed at the demonstration on the campus. (Tr. 261, 279, 294).

On February 1, 1980, Bangert was arrested by FBI agents on charges of the theft and destruction of the United States flag owned by the United States government that had been taken from the Federal Building. (Tr. 222). On the same day, Kandel was arrested by FBI agents on a charge of destruction of the United States flag owned by the United States government that had been taken from the Federal Building. (Tr. 242).

A. *Pre-Trial Proceedings*

On March 10, 1980, prior to trial, Bangert filed a Motion to Suppress Identification in the district court. The motion urged the district court judge to suppress the out-of-court identifications of him previously made, and also any later in-court identifications, on the grounds that the identification procedures before indictment were suggestive and improper and would therefore taint any later identifications. (Record on Appeal, 4–5). A pretrial evidentiary hearing was held on the Motion to Suppress Identification at which Julian Stackhaus, an FBI agent, and three eyewitnesses to the theft of the United States flag, Michelle Owens, John McHale, and Roland Reeves testified. (Tr. 2–32).

Julian Stackhaus testified at the pretrial hearing that he was the FBI investigating officer in the case involving the theft of a United States flag from the Federal Building in St. Louis (Tr. 4); that, as part of the investigation, he interviewed Michelle Owens, John McHale, and Roland Reeves, eyewitnesses to the theft of the United States flag (Tr. 4); that Michelle Owens described one of the people she observed at the Federal Building as a tall, white male with a beard (Tr. 6); that John McHale described one of the people he observed at the Federal Building as a white male, five feet eight inches tall, with a full beard, high forehead, and curly hair, wearing a green jacket, blue pants, and soft soled shoes (Tr. 12); that Roland Reeves described the person he observed at the Federal Building as a white male, five feet nine inches to five feet ten inches tall, of medium build, with a receding hairline, full beard, wearing glasses and a short-length coat (Tr. 15); that after giving the descriptions to agent Stackhaus, the eyewitnesses were shown a series of photographs, consisting of eleven photographs that included three females, two black males, and six white males, only four of whom had facial hair of any kind, and only one, that of Bangert, with a full beard (Tr. 8, 9, 13, 14, 15, 16); and, that agent Stackhaus was aware prior to showing the photographs that the person the FBI was looking for was a white male with a full beard. (Tr. 9).

Witnesses Michelle Owens, John McHale, and Roland Reeves each testified separately at the hearing that each gave a description to Stackhaus of one of the persons observed by each witness at the Federal Building on the morning of November 27, 1979 (Tr. 24, 27, 29); that each was shown a series of

photographs from which each one picked out the person observed (Tr. 25, 28, 30); and, that none were told anything, prior to viewing the display of photographs, concerning the political beliefs of the individuals or whose photograph to pick out. (Tr. 25, 28, 29). These witnesses were not asked to identify anyone in court at the hearing on the Motion to Suppress Identification.

Following this testimony, the district court ruled that the display of photographs used in the identifications procedures was not impermissibly suggestive; that the inclusion of the photographs of the black males and the females did not create a substantial likelihood of improper suggestions made by the FBI agent to the witnesses while showing the photographs; that there was no evidence of tainting but that this finding could be reconsidered during the trial. (Tr. 31–32). Then, the district court denied the Motion to Suppress Identification of the defendant Bangert. (Tr. 32).

B. *Additional Evidence At The Trial*

At the trial, the three eyewitnesses to the taking of the United States flag, Michelle Owens, John McHale, and Roland Reeves, were called by the prosecution as witnesses. Owens and Reeves testified to observing the lowering of the United States flag, and the substitution of the banner on the flagpole in front of the Federal Building. (Tr. 78, 107). McHale testified that he saw Bangert run through a nearby parking lot with a black plastic trashbag containing something. (Tr. 124–127, 134–137). After giving descriptions to police of the person these witnesses saw at the Federal Building, each then identified Bangert from a display of photographs as one of the individuals engaged in taking the United States flag. (Tr. 184, 111, 128, 221). Reeves and Owens each testified to observing the United States flag coming down from the flagpole in front of the Federal Building. (Tr. 79, 56, 107, 112, 120). Owens testified that she was only a few inches away from Bangert on the building steps and looked directly into his face for about a minute, saw him take the United States flag, put it into a black plastic trashbag, and run off with the black trashbag containing the United States flag. (Tr. 107–109, 121). Reeves testified that he was in his car at Market and 15th Street; that shortly after he saw three people lower the United States flag, he saw Bangert run alongside the Federal Building, carrying a black plastic trashbag (Tr. 79–81); that he followed Bangert to a car, saw Bangert open the car door, put the black plastic trashbag in the car, and drive the car away (Tr. 79–81); that the car he saw Bangert get into was a rust-colored 1977 or 1978 model car, with a license plate number BEB–731 or 371. (Tr. 81–82, 91–92). McHale testified that he saw Bangert run past him, carrying a black plastic trashbag that appeared to contain something. (Tr. 124–127). Each of these three witnesses separately stated that while on the way to work in the morning on November 27, 1979, each observed Bangert at or near the Federal Building. (Tr. 78, 107, 124). On November 30, 1979, Owens gave a description to an agent of the FBI stating that the man she observed was white, with a curly beard, mustache, glasses, a black leather jacket and jeans. (Tr. 115–116). Reeves described the man he observed to the agent of the FBI on November 27, stating that the man was white, five feet nine inches to five feet ten inches tall, of medium build, with a full beard, a receding hairline, and a short-length coat. (Tr. 226). McHale, when interviewed by an agent of the FBI on November 27, described the man he observed as white, five feet eight inches tall, wearing glasses, with a receding hairline, curly hair, a full beard, wearing a green Army-type jacket, blue pants, and soft-soled shoes. (Tr. 234). Each of the three witnesses again picked the photograph of Bangert out of the display of photographs, described in detail, earlier (Tr. 84, 111, 128), and each identified him in court at trial as one of the men observed at the Federal Building on November 27, 1979, when the United States flag was taken. (Tr. 83, 109, 127). Bangert was not seated at the counsel table at the time of this identification, but was seated in the first row of the spectator section. (Tr. 76). Each witness stated that the in-court identification by

the witness was based on observation of the events of November 27, 1979, and recollection thereof; and that there was no doubt of the identification (Tr. 84, 111, 128). At the trial, the display of photographs was offered in evidence by the prosecution after testimony of the identifying witnesses. (Tr. 139). The photographic display was repeatedly used, without objection, by counsel for the prosecution and defense in the examination of the eyewitnesses.

Witnesses called by the prosecution traced the stolen United States flag from the time it was ordered by the General Services Administration (GSA) until it was delivered to GSA in St. Louis. (Tr. 150, 153). Evidence was offered that the stolen flag flown on the flagpole in front of the Federal Building in St. Louis measured eight feet eleven ¾ inches by seventeen feet (Tr. 145, 151), and was stamped at the factory with the words "G.S.A.—Property of U. S. Government". (Tr. 202, 203, 205). The witness Michael Liberman, the President of the Valley Forge Flag Company (Valley Forge), supplier of flags to the United States Government, compared the remnants of the United States flag burned at the Washington University demonstration with a new United States flag of government specifications made by Valley Forge. He testified that the remnants and the United States flag supplied by Valley Forge were identical. (Tr. 202, 203). Liberman further testified that the size and type of flag, measuring eight feet, eleven ¾ inches by seventeen feet, was made only for GSA and was not commercially available. (Tr. 205). Chester Blythe, an expert in textile fabrics and fibers, testified that the United States flag burned at the Washington University demonstration appeared to be identical in size to the Valley Forge United States flag and that both flags were manufactured by the same company. (Tr. 218).

The witness Clarence Rippeto, an employee of the State of Missouri Department of Revenue, Bureau of Motor Vehicles, testified that a 1977 Chevrolet with license number BEB–971 is registered to Richard Bangert. (Tr. 140–141).

Defendant Bangert testified in his defense at trial. Bangert testified that he did not steal a United States flag on November 27, 1979; that he was not present at the Federal Building in St. Louis on that day (Tr. 246); that he was present that day at a demonstration at Washington University; that he arrived on the campus of Washington University around 11:00 A.M. (Tr. 247); that he met some people at Mallinckrodt Center, where he was handed a press release by a man named Sam Schor, and made photocopies of the press release; that the press release stated:

> A small contingent of Vietnam Veterans this morning lowered the American flag at the Federal Building at 14th and Market Streets and hoisted a banner reading "U. S. Keep Your Bloody Hands Off Iran."

(Tr. 259, 269); that he did not write the press release (Tr. 258); and, that he did not help make the banners displayed at the demonstration. (Tr. 266).

Bangert further testified that he then proceeded with a group of people to the Quadrangle on the campus of Washington University (Tr. 247); that at the Quadrangle, after some discussion between the demonstrators and the observers, a United States flag, which had been brought to the demonstration, was removed from a plastic trashbag and burned (Tr. 250); that he did not know who brought the United States flag, where it came from, or if it was a flag owned by the United States government. (Tr. 250–251).

Bangert admitted that he helped burn the United States flag but denied knowing that it was owned by the United States government. (Tr. 254).

Bangert also denied that he was involved in any way with the theft of a United States flag from the Federal Building. (Tr. 246). He testified that on November 27 he was wearing a green army jacket, jeans, and soft-soled shoes, (Tr. 256–257); and that the three witnesses called by the prosecution were mistaken in their identification of him as the person they saw at 1520

Market Street. (Tr. 255). Further, Bangert testified that he had loaned his car to a man named Mike Simms on the night of November 26 and that it was not returned to him until 9:00 A.M. on November 27. (Tr. 252–253).

Defendant Kandel testified in his defense at the trial. Kandel testified that, on November 27, 1979, he participated in a demonstration at Washington University (Tr. 278); that he arrived on the campus of Washington University at 11:30 A.M. and went to Mallinckrodt Center where he picked up a banner reading "U. S. Keep Your Bloody Hands Off Iran" (Tr. 281–282); that after about fifteen minutes, he and the group of demonstrators marched to the Quadrangle (Tr. 283); that at the Quadrangle, Kandel read a prepared speech, that was not the press release previously mentioned by Bangert; that a debate began between the demonstrators and the observers (Tr. 284); that a tug-of-war broke out over a United States flag that had been brought to the demonstration and was lying on the ground (Tr. 285); that a few minutes later, a different United States flag was removed from a plastic bag (Tr. 285); that he lit it and it burst into flames (Tr. 285); that he did not bring that United States flag to the demonstration and did not know who did (Tr. 285–286); and that he had read the news release earlier that day, but did not know that the United States flag burned at the demonstration was the same flag that was stolen from the Federal Building. (Tr. 290).

Bangert and Kandel each testified that the purpose of the demonstration at Washington University was to support the Iranian people and to oppose the role that the United States had played in Iranian affairs (Tr. 293–294, 271); that each intended to burn an American flag at the demonstration but had no intention of burning a United States flag belonging to the United States government. (Tr. 294).

Three other witnesses who testified for the defendants stated that Bangert and Kandel have reputations for truth and honesty. (Tr. 275, 277, 296.)

### C. Sentencing Proceedings

During sentencing proceedings, the district judge expressed his belief that Bangert and Kandel had "lied under oath" (Tr. 358); that he did not observe any regret or remorse or repentance expressed by Bangert or Kandel. (Tr. 356–357). These factors obviously were considered by the district judge in determining the sentences of the appellants.

### I.

*The District Court Did Not Err in Allowing Witnesses to Identify Bangert at Trial and in Denying Motion to Suppress Because Those In-Court Identifications Were Reliable*

Bangert claims that the out-of-court identification procedures of the FBI were so impermissibly suggestive that they tainted the entire trial, and therefore required the district court to suppress the out-of-court identifications. In addition, Bangert contends that because of the impermissible suggestiveness of the identification procedures, the district court erred in allowing in-court identifications because they were tainted by the earlier improper out-of-court identification procedures. (Brief of Appellants, 8–13). We disagree.

As summarized earlier, there was extensive testimony, at the hearing on the Motion to Suppress Identification and at the trial, (a) concerning descriptions given to the FBI by eyewitnesses to the taking and carrying away of the United States flag prior to viewing the display of photographs, (b) the identification of Bangert from the group of photographs by these witnesses and (c) the makeup of the display of photographs assembled by the FBI, described earlier. This display of photographs may have been suggestive. And we do not condone the use of a display containing a selection of photographs such as those used in this case. The law requires more than a suggestive out-of-court photographic display or line-up, however, to suppress an out-of-court identification and to find an in-court identification to be tainted.

■ An in-court identification is not tainted by a suggestive photographic display "if a sufficient basis for courtroom identification independent of any improper photo display exists." *U. S. v. Mears* (C.A.8 1980), 614 F.2d 1175, 1177. Moreover, the issue to be addressed is the question of likelihood of misidentification, not solely the suggestiveness of the procedures used. *Neil v. Biggers*, 409 U.S. 188, 198–199, 93 S.Ct. 375, 381–382, 34 L.Ed.2d 401, 411 (1972); *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Bivens v. Wyrick* (C.A.8 1981), 640 F.2d 179; *Sanders v. Wyrick* (C.A.8 1981), 640 F.2d 186.

The criteria to be considered in ruling on the question of tainting by out-of-court photographic identifications have been clearly established by a number of controlling Supreme Court decisions. *See U. S. v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Stoval v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Simmons v. U. S.*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967); *Neil v. Biggers, supra*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite, supra*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The Supreme Court has held that convictions after trial following earlier out-of-court identification will be set aside only on a showing that the earlier out-of-court photographic identification was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. U. S., supra*, 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253 (1967). The factors to be considered in evaluating the likelihood of misidentification, and hence the reliability of the identification, have been enumerated by the Supreme Court and followed by this circuit. *Neil v. Biggers, supra*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Anderson* (C.A.8 1980), 618 F.2d 487; *United States v. Smith* (C.A.8 1979), 602 F.2d 834. These include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the [identification], and the length of time between the crime and the [identification]." *Neil v. Biggers, supra*, 409 U.S. at 199–200, 93 S.Ct. at 382, 34 L.Ed.2d at 411 (1972). *See also Manson v. Brathwaite, supra*, 432 U.S. 98, 87 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

Applying these principles to the facts of this case, it is concluded that the in-court and out-of-court identifications were reliable with no likelihood of irreparable misidentification, despite the suggestiveness of the photographic display. Each eyewitness had ample opportunity to see the defendant Bangert in action on November 27, 1979. Owens was only a few inches away and looked right into his face for about a minute, (Tr. 108); Reeves, while driving his car, followed Bangert from the Federal Building to Bangert's car (Tr. 79); and McHale was standing close to the path of the defendant Bangert and was able to observe him for 10 or 15 seconds, as he ran by. (Tr. 135). Each eyewitness testified to paying close attention to the defendant Bangert because the events of the morning were unusual. Each eyewitness gave detailed descriptions to the FBI and identified Bangert, out-of-court and in-court, with certainty. Each testified that the identification was based on clear observations on November 27, 1979. Further, the time between the observed actions and the descriptions and the identifications given to the FBI was short; Reeves and McHale gave their descriptions to the FBI on November 27, 1979, the day of the observed actions; Owens gave her description to the FBI on November 30, 1979. (Tr. 78, 115, 226). Based upon these facts, we conclude that the trial judge was warranted in finding that the identifications of Bangert by the eyewitnesses were reliable. Therefore, the district court did not err in refusing to suppress the out-of-court identifications or in allowing the in-court identifications of Bangert.

## II.

### *The Evidence Was Sufficient to Sustain a Verdict of Guilty*

The appellants, Bangert and Kandel, contend that the evidence at trial was insuffi-

cient to prove that the appellants burned a United States flag belonging to the United States government, or that they knew that the flag they burned belonged to the United States as charged in Count II (Brief of Appellants, 14, 16).

■ In order to convict the defendants on Count II, destruction of property of the United States, it was necessary for the prosecution to prove by the evidence beyond a reasonable doubt that the flag that was burned was owned by the government; that there was actual damage done to the flag; and that the defendants burned the flag with knowledge that they were violating the law. *See: United States v. Briddle* (C.A.8 1971), 443 F.2d 443, *cert. denied*, 404 U.S. 942, 92 S.Ct. 291, 30 L.Ed.2d 256; *United States v. Beneke* (C.A.8 1971), 449 F.2d 1259. But, in a criminal prosecution when it is necessary for the prosecution to prove the existence of a particular state of mind or intent on the part of the defendants, the proof may be made by circumstantial evidence. *United States v. Hicks* (C.A.8 1980), 619 F.2d 752.

■ In this case, there was substantial evidence in the record to support the findings of the jury of ownership of the burned flag by the United States, and damage to that United States flag. Further, there was substantial evidence from which the jury could infer that the defendants knew the flag they burned was a flag owned by the United States government. The prosecution produced several witnesses to identify and trace the United States flags produced for GSA of the United States, and to prove that the stolen United States flag, owned by the United States, was burned at the Washington University demonstration by the defendants acting in concert.

It is clear that the prosecution presented substantial evidence to support the verdicts of the jury. The jury weighed all of the evidence and found beyond a reasonable doubt that the flag that was burned was owned by the United States, and that both defendants had knowledge that it was a flag owned by the United States. Therefore, we conclude that neither of the convic-

tions of appellants on Count II should be set aside because of insufficiency of the evidence.

### III.

### All Appropriate and Necessary Precautions Were Taken by the District Court to Ensure Defendants a Fair Trial

The defendants contend that the district court erred in not granting a mistrial or a continuance because of undue publicity, unconnected with the defendants which, they contend, inflamed the nation and the jury. (Brief of Appellants, 19). We conclude that the district court took all appropriate and necessary precautions to ensure that the defendants were given a fair trial free from prejudice and influence from prejudicial publicity.

At the time of the trial, March 10, 1980, news coverage of the hostages in Iran, unconnected to the defendants or their trial, continued to be featured in the news media. Because the defendants had openly expressed their sentiments concerning United States involvement with Iran, in the demonstration in which they and their associates participated, and in the display of the banners at the demonstration, the defendants contend that the jury was so prejudiced as to deprive them of a fair trial. (Brief of Appellants, 19, 21; Tr. 138). We disagree.

■ It is well established that the defendants have a right to a fair trial by an impartial jury free from outside influences, including potentially prejudicial news media reports of events connected with the matter on trial. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The Supreme Court has suggested several preventive and protective precautions when it appears that there is a reasonable likelihood that prejudicial news dissemination prior to trial will prevent a fair trial. The preventive and protective procedures include: continuance of the trial to a later date when publicity has subsided; changing venue; conducting

intensive and extensive *voir dire* of the jury panel; and sequestering the jury. *Sheppard v. Maxwell, supra*, 384 U.S. at 363, 86 S.Ct. at 1522, 16 L.Ed.2d at 620 (1966).

■ In this case, the defendants did not ask for a continuance or a change of venue. The record reveals that, while the jury was not sequestered or sequestration requested, an intensive *voir dire* examination of the jury panel was conducted. (Tr. 34–60). Further, the jury was instructed several times not to read any newspapers, listen to the radio, or watch television. (Tr. 61–62, 66, 135–136, 198, 298–299). At the conclusion of the trial, the court read an instruction requested by defense counsel which directed the jury to disregard any issues relating to foreign policy or events in the news. (Tr. 346). During trial, defense counsel did, however, request a mistrial because of intensive news coverage of the events in Iran. (Tr. 138–139). The district court refused to grant the requested mistrial, noting that the jury had been repeatedly admonished not to read the newspapers or listen to the news and adequately questioned on *voir dire*. The district judge also noted that he would later thoroughly instruct the jury to consider only the evidence at trial. (Tr. 138–139).

This case does not involve a claim of specific prejudicial pretrial publicity about the defendants but, rather, a general claim of prejudicial publicity of world events during trial. The publicity complained of did not concern the defendants or their trial. The only possible connection between the publicity of world events and the defendants was the subject of relations between the United States and Iran, publicity which was initiated by the defendants in the context of world events.

The district court determined that sufficient precautions had been taken to ensure a fair trial to defendants, and reliably found that the publicity in question did not constitute prejudicial publicity in this case. (Tr. 138–139). In such circumstances, the finding of the trial judge should be accorded deference for he "has large discretion in ruling on the issue of prejudice resulting

from the reading by jurors of news articles concerning the trial". *United States v. Williams* (C.A.8 1979), 604 F.2d 1102, 1114. We conclude that the district court did not abuse its discretion in refusing to grant a mistrial or to initiate a continuance in this case.

### IV.

### *The District Court Did Not Impose Excessive Sentences*

■ Defendants contend that the district court abused its discretion by imposing excessive sentences in this case. (Brief of Appellants, 22). Section 641, Title 18 U.S.C., under which defendant Bangert was charged in Count I, provides that when the value of the property stolen is less than one hundred dollars, the guilty party shall be fined not more than one thousand dollars, imprisoned not more than one year, or both. Section 1361, Title 18 U.S.C., under which both defendants were sentenced in Count II states that when the value of the property destroyed is not more than one hundred dollars, the sentence imposed shall be by a fine of not more than one thousand dollars, or imprisonment for not more than one year, or both.

On Count I, Bangert was sentenced to imprisonment for six months and a fine of one thousand dollars was imposed. On Count II, both defendants were sentenced to imprisonment for one year and a fine of one thousand dollars was imposed.

The Supreme Court of the United States has held that in the absence of exceptional circumstances, not present in this case, "a sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review." *United States v. Tucker*, 404 U.S. 443, 447; 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). This is also the controlling rule in this circuit and dispositive of the issue in this case. *United States v. Moss* (C.A.8 1979), 591 F.2d 428; *Woosley v. United States* (C.A.8 1973), 478 F.2d 139. In this case, conviction on each Count authorized a maximum possible sentence of one year imprisonment and imposition of a

fine of one thousand dollars. Defendants' sentences were within the statutory limits.

We, therefore, conclude that because the sentences did not exceed statutory limits, and were not excessive in the circumstances, the sentences were lawfully imposed. The only proceeding, available after final judgment, to request the reduction of a lawful sentence is a motion for reduction of sentence under Rule 35, F.R.Cr.P.

## V.

### Imposition of Consecutive Sentences Was Appropriate In This Case

Appellant Bangert contends that the district court erred in imposing consecutive sentences for the two offenses of which he was convicted. (Brief of Appellants, 25). Bangert further argues that the two offenses constitute one continuous incident, thus requiring that he not be punished twice without a clear indication from Congress that it authorizes such a result. (Brief of Appellants, 25–28).

█ It is correct that Congress has by law proscribed cumulative punishments for offenses arising under the same statute which exceed the maximum set by the statute. *United States v. Jones* (C.A.9 1973), 487 F.2d 676; *United States v. Ackerson* (C.A.8 1974), 502 F.2d 300. However, "there is no constitutional impediment to Congress' authorizing cumulative sentences for a single act that may violate more than one statute when the offenses created by the statute are not identical." *United States v. Clements* (C.A.9 1972), 471 F.2d 1253, 1254; *United States v. Jones, supra,* 487 F.2d 676.

█ Furthermore, "Congress has the power to establish that a single act constitutes more than one offense, at least as long as each offense requires proof of a fact the other does not." *United States v. Jones, supra,* 502 F.2d at 679. Imposition of cumulative sentences in such circumstances has been approved consistently by the Supreme Court. The Supreme Court stated in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932) and reasserted in *Whalen v. United*

*States,* 445 U.S. 684, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980) and *Albernaz v. United States,* —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d —— (1981) No. 79–1709, March 9, 1981 that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." This test is used "to determine whether Congress has in a given situation provided that two statutory offenses may be punished cumulatively." So, if the act or transaction is punishable under two separate statutes and requires proof of two sets of facts, cumulative sentencing is appropriate. This rule is followed by this circuit. *Brinkley v. United States* (C.A.8 1977), 560 F.2d 871.

In this case, the offenses for which Bangert was convicted were not only contained in different statutes but they required proof of different elements of ultimate facts to sustain a conviction under each Count. To prove a violation of § 641, Title 18 U.S.C., the prosecution had to prove that the defendant intended to and did steal the property of the United States having a value of less than one hundred dollars. To prove a violation of § 1361, Title 18 U.S.C., the prosecution had to prove that the defendant intended to, and did destroy property of the United States having a value of less than one hundred dollars. It is clear that the material elements of these two offenses are different.

We therefore conclude that whether the offenses for which Bangert was convicted were parts of one or more continuous transactions, they were punishable under two separate statutes, requiring proof of different material facts. Therefore, the imposition of consecutive sentences was appropriate.

## VI.

### The District Court Did Not Consider Impermissible Factors In Determining Defendants' Sentences

█ While *amicus curiae* cannot independently assign error, we will comment on

the contentions of *amicus curiae*, the American Civil Liberties Union of Eastern Missouri, that fall within general contentions of the appellants. *Amicus curiae* contends that the district court considered impermissible factors in determining defendants' sentences, infringing on their Fifth and First Amendment rights. (Brief of *Amicus Curiae*, 3). Specifically, *amicus curiae* claims that the judge's consideration of his belief that the defendants lied at trial was impermissible; that consideration of defendants' lack of remorse violates defendants' Fifth Amendment rights against self-incrimination; and that the nature of the crime itself requires caution in sentencing to ensure no infringement upon defendants' First Amendment rights to express political beliefs. (Brief of *Amicus Curiae*, 4–6).

At the outset, we note that the district judge took special care to make it clear that he was not sentencing the defendants because of their political beliefs or political activities. (Tr. 357–358). The district judge specifically stated:

"[M]y sentence in this matter has nothing to do with your political beliefs or your membership in whatever organizations you belong to or the fact that you were expressing yourselves in a peaceful demonstration.... And you are surely not being sentenced because of Mr. Bangert's, at least, feeling about the Vietnam War, because certainly any thinking person, from time to time, has doubts about actions that may have been taken." (Tr. 357–358).

Consideration of political beliefs, as distinguished from criminal activity, would clearly be impermissible in determining defendants' sentences, because it would impair the rights of the defendants under the First Amendment, protecting public expression of their political beliefs, by words and symbols. *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969). We find, however, that these sentences did not impair rights of the defendants guaranteed by the First Amendment.

The district judge did consider other matters in determining defendants' sentences. The district judge stated:

"I do think, I'd observe that the jury believed, and I agree with them, that you are both liars, and in that regard, I believe you lied under oath.... It's one thing to violate the law and to accept responsibility for it.... It's a little different thing to flaunt the violation and then to lie about it under oath." (Tr. 358–359).

Further, the district judge stated:

"I don't observe any regret, remorse, whatever we might call it.... I would expect to find a little something and I find nothing in that area from these gentlemen." (Tr. 356–357).

*Amicus curiae* contends that these comments are based on impermissible factors, infringing upon defendants' Fifth Amendment rights against self-incrimination. (Brief of *Amicus Curiae*, 4). We disagree.

The Supreme Court in *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), held that it is permissible for a judge in imposing sentence to consider his belief that a defendant lied at trial. In that case the Supreme Court stated that the truthfulness of a defendant, while testifying in his own behalf is probative of his prospects for rehabilitation, and relevant to sentencing. *United States v. Grayson, supra*, 438 U.S. at 50, 98 S.Ct. at 2616, 57 L.Ed.2d at 590. The Supreme Court reasoned that it is necessary to consider in sentencing the whole person and personality of a defendant, as manifested by his conduct at trial, and his testimony under oath may shed light on the sentencing decision. *United States v. Grayson, supra*, 438 U.S. at 53, 98 S.Ct. at 2617, 57 L.Ed.2d at 591. In that case consideration by the district judge of the truthfulness of the testimony of each defendant in imposing sentences was held to be permissible.

For the same reason it was permissible for the district judge to consider lack of truthfulness and lack of remorse of the defendants in deciding their sentences.

The district judge has wide discretion in determining, within statutory limits, what sentences to impose and may appropriately conduct a broad inquiry largely unlimited in the kind of information he may consider. *United States v. Grayson, supra,* 438 U.S. at 50, 98 S.Ct. at 2615–2616, 57 L.Ed.2d at 590; *United States v. Tucker, supra,* 404 U.S. at 446, 92 S.Ct. at 591, 30 L.Ed.2d at 596. These propositions have been enunciated by several courts as authority for holding that comments by the sentencing judge pertaining to lack of remorse do not indicate an impermissible intent on the part of the judge to penalize the defendant for assertion of his Fifth Amendment rights. *United States v. Miller* (C.A.1 1978), 589 F.2d 1117; *United States v. Richardson* (C.A.5 1978), 582 F.2d 968; *United States v. Allen* (C.A.7 1980), 596 F.2d 227, *cert. denied,* 444 U.S. 871, 100 S.Ct. 149, 62 L.Ed.2d 97 (1980).

We find no error in the imposition of the sentences upon appellants.

For the foregoing reasons, the judgment of the district court is affirmed.