**UNITED STATES of America, Appellee,**

v.

**James W. LEWIS, Appellant.**

**No. 83–1947.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 26, 1984.

Decided June 29, 1984.

---

John T. Maughmer, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for appellant.

Robert G. Ulrich, U.S. Atty., Robert E. Larsen, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before McMILLIAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

James W. Lewis was convicted on six counts of mail fraud for devising and implementing a fraudulent credit card scheme. On appeal Lewis argues that the district court[1] should have held that the warrantless opening of a mailbox bearing the name "David Woods" tainted all subsequently obtained search warrants, rendering all evidence produced by those warrants inadmissible. He also contends that the first search warrant obtained was not based upon probable cause because the affidavit contained insufficient information upon which to gauge the credibility or reliability of the informant. Furthermore, he contends that the district court erred in denying a motion to dismiss the indictment due to improper and prejudicial publicity that denied him a fair trial by an impartial jury. Finally, he argues that he was denied legal research facilities adequate to enable him to aid in the preparation and presentation of his defense. We affirm the convictions.

John E. Ryan reported to the police that his VISA credit card was being used fraudulently. The police discovered that some of the merchandise being purchased with this credit card was delivered to a mailbox at 8342 Swartz Road, Kansas City, Kansas. Detective William C. Moore of the Kansas City, Missouri Police Department drove there and found a mailbox mounted in a two-gallon can filled with concrete, lying on the ground in a ditch, and in a state of disrepair. The mailbox was in a rural area set among a row of similar mailboxes. It had the name "David Woods" written on its side. No one in the neighborhood knew of a David Woods or an 8342 Swartz Road residence, and further police investigation revealed no such person or residence.

Detective Moore then peered into the box to attempt to determine when mail was being picked up. On October 29, 1981, he opened the mailbox and found a Jackson County property assessment bill addressed to David E. Woods. He took the tax bill to his sergeant, who opened it, inspected the contents, resealed the envelope, and had Detective Moore replace it in the mailbox. Detective Moore used the identification number listed on the tax bill to learn from the Jackson County Recorder's Office that the property in question had been sold to David E. Woods by Record S. and Helen Rowland. When Moore interviewed them, the Rowlands denied that they had sold the property to anyone. When questioned as to who would have information about the property, the Rowlands mentioned the name of James W. Lewis, who had prepared their tax returns for several years.

Police surveillance on the David Woods mailbox commenced on November 9. On November 11, Lewis was seen taking mail from the mailbox, as well as physically picking up the mailbox and placing it in his car. The police tracked Lewis to his residence at 5723 Troost, Kansas City, Missouri, where they observed him repairing the mailbox.

A few days later a postal inspector asked Mrs. Joyce Williams, former wife of John

---

1. The Honorable Ross T. Roberts, United States District Judge for the Western District of Missouri.

Ryan, to pay a debt owed by Ryan to Lewis and to attempt to determine if there were typewriters in the Lewis office when she did so. Because she had only $22.00 on her person, the inspector gave her an additional $50.00 to pay the debt. While at the Lewis office Mrs. Williams saw two typewriters.

A federal search warrant was obtained with respect to the typewriters and on December 4, postal inspectors, detectives, and police officers went to the 5723 Troost address. They secured the premises, performed an initial sweep and took photographs. Numerous items relating to the credit card fraud investigation were in plain view. A second search warrant was obtained and another search conducted later that day. Four additional search warrants were then obtained and executed.

At the time the indictments in this case were returned, Lewis was the subject of a nationwide manhunt not only in connection with the deaths resulting from cyanide-laced Extra Strength Tylenol capsules but also with respect to an extortion letter sent to Johnson & Johnson, its manufacturers. Between September 30, 1982, and May 23, 1983, the date of Lewis's trial, numerous television and radio broadcasts and approximately 135 Kansas City newspaper stories and articles mentioned or discussed Lewis and the Tylenol investigation.

Lewis moved to suppress the evidence concerning the warrantless opening of the David Woods mailbox, additionally claiming that all subsequent search warrants, and therefore all evidence at the trial, were fruit of this allegedly illegal search. The district court conducted a hearing and granted the motion to suppress with respect to all testimony concerning the search of the mailbox, the tax bill addressed to David E. Woods which was seized and opened, and all testimony relating thereto. The court determined, however, that the suppressed information was minor and cumulative at best, and that the first search warrant could properly have been issued in the absence of such informa-

tion. Thus, the court concluded that the subsequent warrants did not stem from any illegality. The court further ruled that the reliability of Mrs. Williams as an informant had been sufficiently shown, finding that she was simply an ordinary citizen and a victim of the fraudulent scheme. Her active cooperation with law enforcement officials, even though the fifty dollars was not reimbursed, did not require her reliability to be tested independently. Moreover, her information was corroborated by other facts in the affidavit.

## I.

■ The government argues that Lewis has no standing to raise the fourth amendment issues arising from the search of the David Woods mailbox. We recognize that his possession of the mailbox and of its mail does not confer upon Lewis "automatic standing" to raise a fourth amendment challenge. *United States v. Salvucci,* 448 U.S. 83, 92–93, 100 S.Ct. 2547, 2553–2554, 65 L.Ed.2d 619 (1980). Rather, fourth amendment rights are personal in nature, *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978), and the critical question is whether governmental officials violated any legitimate expectation of privacy held by Lewis. *Rawlings v. Kentucky,* 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980); *Salvucci,* 448 U.S. at 92, 100 S.Ct. at 2553; *United States v. Weatherd,* 699 F.2d 959, 961 (8th Cir. 1983); *see United States v. Reed,* 733 F.2d 492 at 500–501 (8th Cir.1984).

The district court did not squarely face this question. Because the district attorney stated at the suppression hearing that the government did not intend to introduce evidence of the mailbox search or letter contents at the trial, the district court simply granted that aspect of the motion to suppress. We believe that we need not address the standing issue because the validity of the challenged search warrants may be decided on other grounds.[2] We

---

**2.** We have no difficulty in concluding that Lewis lacked a legitimate expectation of privacy in

the mailbox and its contents and, accordingly, that he would have no standing to raise the

simply assume without deciding that Lewis has standing to raise the fourth amendment questions regarding the mailbox search.

## II.

■ In reviewing the district court's determinations made in the context of a motion to suppress, we apply the clearly erroneous standard. *United States v. Ross*, 713 F.2d 389, 392 (8th Cir.1983); *United States v. Childress*, 721 F.2d 1148, 1150 (8th Cir.1982). Under this standard we must affirm the decision unless it lacks the support of substantial evidence, it evolves from an erroneous view of the applicable law, or upon considering the entire record we are left with a definite and firm conviction that a mistake has been made. *Ross*, 713 F.2d at 392.

## A.

Lewis argues that the court erred in denying that portion of the motion to suppress which sought to exclude all materials seized as a result of the six search warrants. He claims that the information obtained in the opening of the mailbox was essential to the issuance of the first warrant and that the other five warrants were dependent upon the first. Accordingly, he contends, the fruits of all five further search warrants were tainted and inadmissible. He argues that there was no showing of sources of information independent of the illegality.

■ It is beyond question that evidence obtained pursuant to an illegal search is the "fruit of the poisonous tree" and cannot be used against an individual. *Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). We have not found it necessary to decide, but assuming that the opening of the David Woods mailbox and of the tax bill within constituted an illegal search, we think the record before us nevertheless establishes that the evidence stemming from all six warrants had been procured by independent means "sufficiently distinguishable to be purged of the primary taint." *Brown*, 422 U.S. at 599, 95 S.Ct. at 2259; *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417. Evidence from an independent source will not be excluded, *United States v. Crews*, 445 U.S. 463, 475, 100 S.Ct. 1244, 1252, 63 L.Ed.2d 537 (1980); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *United States v. Stover*, 565 F.2d 1010, 1013 (8th

issue concerning evidence flowing from the mailbox search. It was unlocked and situated in a rural area accessible to the public. It bore the name "David Woods," yet investigation revealed no one by that name and no residence at the designated address, 8342 Swartz Road. The police took note of the mailbox only because merchandise fraudulently purchased with John Ryan's credit card was sent there. He had every expectation that governmental officials would regularly open the box to deliver mail. Furthermore, the opening of the tax bill addressed to "David E. Woods" and not to Lewis cannot be said to have infringed *his* reasonable privacy expectations.

The United States Supreme Court has this Term further expounded upon the concept of what constitutes a reasonable expectation of privacy as enunciated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *United States v. Jacobsen*, —— U.S. —— at ——, 104 S.Ct. 1652 at 1661, 80 L.Ed.2d 85 (1984), the Court, per Justice Stevens, stated:

The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities.

We believe Lewis' expectation of privacy to be akin to that of the burglar plying his or her trade in a summer cabin during the off season, an example drawn in *Jacobsen* and *Rakas*; while the burglar may have a thoroughly justified subjective expectation of privacy, it is not one that the law recognizes as legitimate.

His presence, in the words of *Jones* [*v. United States*, 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960) ], is "wrongful," his expectation of privacy is not one that society is prepared to recognize as "reasonable." *Katz v. United States*, 389 U.S., at 361 [88 S.Ct., at 516] (Harlan, J., concurring).

*Jacobsen*, —— U.S. at —— n. 22, 104 S.Ct. at 1661 n. 22. A mailbox bearing a false name with a false address and used only to receive fraudulently obtained mailings does not merit an expectation of privacy that society is prepared to recognize as reasonable.

Cir.1977), if the government shows by a preponderance of the evidence that it is untainted, *United States v. Matlock,* 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974); *Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969).

We believe such a showing was made. Had the affidavit made no mention of those individuals or facts discovered directly or indirectly through the mailbox search, the remaining facts would still have been sufficient to support a finding of probable cause for issuing the first search warrant. The Ryans engaged James W. Lewis to prepare their tax returns for seven to ten years and furnished him information concerning their residence, telephone number, Social Security numbers, checking and savings accounts, and credit card accounts. Two checks written on the VISA credit card account resulted in mail going to the mailbox at 8342 Swartz, Kansas City, Kansas; the Ryans did not write or authorize the issuance of these checks. The affidavit further stated that Joyce Williams' Master Charge and Penney credit cards had been used without her authorization, and the resultant merchandise mailed to 8342 Swartz.

The affidavit also stated that typewritten credit card applications in the name of John E. Ryan were sent to eight businesses in the Kansas City area. Ryan told police that he did not apply for these cards but confirmed that the information on the applications was accurate, except for the address listed on the cards, 2032 Hazel, Kansas City, Missouri. Trash at the curb line at 5723 Troost was recovered and found to contain a notice to repair the mailbox at 8342 Swartz and various items naming John E. Ryan, J.E. Ryan, D.E. Wood & Associates, and D.L. Wood & Associates, all with the address of 8342 Swartz. A mail cover of the 8342 Swartz address listed approximately seventy-eight pieces of mail over a 45-day period, each sent to the name of David Wood, D.E. Woods, D.E. Woods & Associates, John Ryan, John E. Ryan, or other combinations of the names. The David Woods mailbox on Swartz Road was placed under surveillance, and Lewis was seen taking the mailbox, placing it in his vehicle, and driving to 5723 Troost, where he was seen repairing it. Joyce Williams told the affiant that she entered the premises at 5723 Troost and observed two typewriters.

We conclude that this information in the affidavit amply established probable cause for issuance of the first search warrant. This information was completely independent of any evidence or leads discovered by taking and opening the letter from the mailbox. While the discovery of the Rowlands further implicated Lewis, this tie was not, as Lewis argues, such a significant break in the case that it tainted all of the evidence. The police did not pursue the Rowlands' connection to Lewis; instead, the next step in the investigation was the placing of surveillance on the mailbox itself. Certainly this surveillance was fully justified by the reports from John Ryan and Joyce Williams, and by the discovery of the suspicious Swartz Road mailbox. That surveillance in itself proved successful, identifying Lewis both at the mailbox and also transporting the box to his address at 5732 Troost. Had there been an independent focus upon Lewis before such surveillance we might have a different case. The discovery of Lewis at the mailbox, however, was sufficient to show the independent nature of the subsequent evidence and its lack of taint. We conclude that the district court properly denied Lewis's motion to suppress.

B.

Lewis also argues that the affidavit filed in support of the first warrant lacked information sufficient to determine the credibility or reliability of the informant, Mrs. Williams, concerning statements in the affidavit attributed to her. When an informant furnishes information that is critical and necessary to the determination of probable cause, it must be subjected to careful analysis. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76

L.Ed.2d 527 (1983); *Spinelli v. United States*, 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969). In *Gates*, the Supreme Court abandoned the *Aguilar-Spinelli* "two-pronged" test and declared that the determination of whether an informant's tip supports probable cause involves a consideration of the "totality of the circumstances." *Gates*, 103 S.Ct. at 2329; *see United States v. Rodgers*, 732 F.2d 625 at 631 (8th Cir.1984). Here the affidavit stated that Mrs. Williams was a private citizen and a victim of credit card fraud, who volunteered to assist the postal inspector in this case. Like the telephone repairman who volunteered information in *United States v. Ross, supra,* she had no motive to falsify and her basis of knowledge was clearly revealed in the affidavit. The fifty dollars given to her by the postal inspector to pay the Lewis debt scarcely transforms her into a professional informant, which might raise other credibility concerns. Moreover, the nature of her information—the existence of Lewis's typewriters—was easily corroborated. Weighing the totality of the circumstances, we conclude that the affidavit set forth sufficient facts about Mrs. Williams and the information she provided from which probable cause could be found.

### III.

■ Lewis argues that the massive publicity concerning the Tylenol investigation made it impossible for him to be given a fair trial. He specifically argues that the indictment was brought by a grand jury presumptively prejudiced by the publicity, and that the publicity was so prejudicial and inflammatory that he was presumptively and actually unable to obtain an impartial jury. He argues that no voir dire procedure would reasonably have ensured that prejudices harbored by prospective jurors would be discovered.

With respect to Lewis's allegations of grand jury bias, we have held that to challenge an indictment successfully, a defendant must show that such pretrial publicity caused actual prejudice and that the indictment returned was the result of that prejudice. *United States v. Civella*, 648 F.2d 1167, 1173 (8th Cir.1981); *McWilliams v. United States*, 394 F.2d 41, 44 (8th Cir. 1968). We cannot conclude that Lewis's indictment was the result. of prejudice. The facts set forth in the indictment had a solid factual basis, as indicated in our discussion of the fourth amendment issues. Furthermore, Lewis offered no proof that the indictment was the result of any actual prejudice.

In conducting the voir dire examination, the district court read to the jury panel a strongly worded instruction that the publicity concerning the Extra Strength Tylenol investigation and Lewis's indictment for other charges in the Northern District of Illinois had nothing to do with the case before them. Lewis and his attorneys had agreed that the best voir dire approach would be to raise the Tylenol publicity concerns before the prospective jurors rather than to say nothing and entail attendant risks. Lewis's attorneys prepared and submitted the instruction, but specifically without waiving Lewis's rights in the motion to dismiss based on pretrial publicity. After excusing several venirepersons for cause, the court questioned 45 prospective jurors individually outside the presence of the panel as to the effect of pretrial publicity.[3]

---

**3.** Essentially the court asked each panel member:

  1. What was the nature of the news to which the panel member had been exposed, *i.e.,* television, radio or newspaper?
  2. What did the news report cover, *i.e.,* the Kansas City case, the Tylenol killings, or the extortion case?
  3. What did the panel member recall of the news report?

  4. Would such news report cause the panel member to have an opinion as to the guilt or innocence of the defendant?
  5. Would the panel member be able to set aside such news report and base the verdict on the evidence in this case?
  6. Would the panel member be satisfied, if he or she were the defendant in this case, to have his or her guilt or innocence judged by someone in the same frame of mind as the member?

The court invited counsel to suggest additional questions at any time during the individual voir dire examination. On at least one occasion, Lewis's attorney responded that he thought the individual questions were fair and designed to get at the truth.

After receiving the general instruction, 67 of the 74 prospective jurors indicated they had heard of Lewis. Of the eight who had not, only one served as a juror. After conducting the individual voir dire, the court excused twelve more prospective jurors, overruling only two of Lewis's challenges for cause. Peremptory challenges were made and the jury, including two alternates, was seated.

With respect to the voir dire procedures, we have held that where there has been pervasive pretrial publicity the district court should exercise great care to ensure that no prejudice results to the defendant; intensive and extensive voir dire examination will satisfy this requirement. *United States v. Bliss*, 735 F.2d 294 at 299–301 (8th Cir.1984); *United States v. Bangert*, 645 F.2d 1297, 1306 (8th Cir.1981). We have also held that questioning of each juror individually outside the presence of the panel should be conducted to determine what the jurors have heard and what effect it would have on their ability to render an impartial verdict. *United States v. Bliss*, at 300; *United States v. Poludniak*, 657 F.2d 948, 958 (8th Cir.), *cert. denied*, 455 U.S. 940, 102 S.Ct. 1431, 71 L.Ed.2d 650 (1982); *United States v. Jackson*, 549 F.2d 517 (8th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977).

It is significant here that Lewis did not move to strike for cause any of the twelve veniremen that were selected to hear the case. The district court denied only two of Lewis's challenges for cause, and our examination of the record reveals no abuse of discretion in so doing; while those two panel members each initially seemed uncertain, further individual questioning elicited

responses sufficient to assure the court that they could serve fairly and impartially. At the close of the jury selection process, Lewis moved to dismiss the indictment because of the pretrial publicity. The district court responded that "the answers we have received from the jurors convince me, and I believe the record demonstrates, that it is, in fact, possible to obtain a fair and impartial jury for this trial." The district court has broad discretion in this area and we accord it deference. *Bangert*, 645 F.2d at 1306. Lewis has filed with this court a collection of newspaper articles, and our perusal indicates that at least one or two were letters to the editor authored by Lewis himself. Other than this, there is no evidence offered to demonstrate that the publicity was too great for the court to overcome. No doubt the Tylenol investigation was emotionally charged, but as the newspaper articles indicated, it was evident that publicity about the investigation of Lewis had narrowed to the extortion issues rather than to accusations that he had been responsible for the contamination of the drug.

We have carefully studied the voir dire examination of the individual jurors. In light of the strong preliminary instruction, the answers given by the jurors in the individual examination and the court's findings that a fair and impartial jury could be selected, to hold the district court in error would require us to find that the jurors had disregarded the strong instruction and violated the oath to render a verdict in accordance with the evidence in the case. Nothing in the record suggests that they did so, and we cannot make such a finding.

This case but underscores the difficulty that is presented when substantial publicity surrounds the accused individual. It is significant here, however, that the publicity concerning Lewis for the most part dealt with issues totally unrelated to the charges in this case, which were based on a rather narrow but fully developed investigation.

7. If the panel member believed after hearing the evidence in the case that the government had failed to prove the defendant guilty beyond a reasonable doubt, would the panel member be inclined to vote guilty simply because of the publicity or public pressure?

The district court confronted a most difficult situation in view of the pervasive publicity but carefully handled the situation and assured itself that a fair jury could be selected. We find no error in the manner in which the district court conducted the jury selection.

#### IV.

■ Lewis finally contends that the law library at the Jackson County Jail was inadequate to meet his research needs and that his access to it was seriously restricted. Lewis also claims that he was not provided with a typewriter, writing materials or a suitable place to work. The district court conducted a pre-trial hearing on this issue. The government suggested that library facilities at the Leavenworth Penitentiary and the Springfield Medical Center were substantially more complete, but the defense rejected the alternative of transferring Lewis to these facilities. Nineteen of the specific items Lewis sought were for use in other cases. The district court ordered defense counsel to photocopy cases for Lewis's use in the pending criminal case, the costs to be borne by the government.

■ Here Lewis was provided representation by two experienced and competent lawyers, one with extensive criminal trial experience and the other a capable young lawyer who recently completed a clerkship with a United States District Judge. A defendant in a criminal case does not have a constitutional right both to represent himself and to be represented by counsel. *United States v. Olson,* 576 F.2d 1267, 1270 (8th Cir.1978). The district court did not err in ruling on this issue.

In conclusion, we have carefully reviewed the arguments raised by Lewis and conclude that no error has been demonstrated in any of the respects urged. We affirm his conviction on all counts.

McMILLIAN, Circuit Judge, concurring.

I concur in the affirmance of appellant's mail fraud convictions. I agree with Judge John R. Gibson's fourth amendment analysis and write separately only to explain why I disagree with the "standing" analysis set forth in note 2.

I would hold that appellant had a legitimate expectation of privacy in the mailbox and its contents. In my opinion the fact that the mailbox was unlocked, was in somewhat dilapidated condition, located in a rural area accessible to the public, bore a fictitious name and address, was regularly opened by postal employees to deliver mail, and was used by appellant in furtherance of his fraudulent credit card scheme, even when considered together, do not diminish appellant's legitimate expectation of privacy in the mailbox.

This analysis is not inconsistent with the burglar in the summer cabin hypothetical cited by Justice Stevens in *United States v. Jacobsen,* —— U.S. ——, 104 S.Ct. 1652, 1661 n. 22, 80 L.Ed.2d 85 (1984), *citing Rakas v. Illinois,* 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 430–31 n. 12, 58 L.Ed.2d 387 (1978). Like the burglar who breaks into a summer cabin during the off season, appellant would not have a legitimate expectation of privacy in the mailbox if he had stolen it or had broken into it. However, it was undisputed that the mailbox belonged to appellant. In my view appellant's understanding that access to *his* mailbox would be limited (or at least that police officers could not lawfully open it or inspect its contents without a search warrant) is clearly one recognized and permitted by society. This understanding is not affected by the fact that appellant used the mailbox in furtherance of his fraudulent credit card scheme. As noted by Justice Brennan in his dissenting opinion in *United States v. Jacobsen,* 104 S.Ct. at 1670 (citations omitted):

In determining whether a reasonable expectation of privacy has been violated, we have always looked to the context in which an item is concealed, not to the identity of the concealed item. Thus in cases involving searches for physical items, the Court has framed its analysis first in terms of the expectation of privacy that normally attends the location of

the item and ultimately in terms of the legitimacy of that expectation.... [T]he "Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." The fact that a container contains contraband [or, in the present case, evidence of mail fraud], which indeed it usually does in such cases, has never altered our analysis.

I would hold that appellant had a legitimate expectation of privacy in the mailbox and its contents and would affirm the district court's order granting appellant's motion to suppress all testimony about the search of the mailbox and the opening of the tax bill. However, I also agree that there was sufficient information in the search warrant affidavit, independent of the unlawful search of the mailbox, to support the finding of probable cause for the issuance of the first search warrant. Accordingly, I concur in the affirmance of appellant's convictions.