United States of America v. Lynne Stewart

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: February 29, 2012          Decided: June 28, 2012)

Docket No. 10-3185

------------------------------------

UNITED STATES OF AMERICA,

Appellee,

- v -

AHMED ABDEL SATTAR, also known as Abu Omar, also known as Dr. Ahmed, YASSIR AL-SIRRI, also known as Abu Ammar, MOHAMMED YOUSRY,

Defendants,

LYNNE STEWART,

Defendant-Appellant.

------------------------------------

Before:    WALKER, CALABRESI, and SACK, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (John G. Koeltl, Judge), on remand from this Court, see United States v. Stewart, 590 F.3d 93 (2d Cir. 2009), sentencing defendant Lynne Stewart principally to 120 months' imprisonment on her convictions for conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; conspiracy to provide and to conceal the provision of material support to a conspiracy to kill and kidnap persons in

a foreign country, in violation of 18 U.S.C. § 371; providing and concealing the provision of material support to a conspiracy to kill and kidnap persons in a foreign country, in violation of 18 U.S.C. § 2339A & § 2; and making false statements to the United States Department of Justice and the Bureau of Prisons, in violation of 18 U.S.C. § 1001.

Affirmed.

Appearances:                    ANDREW S. DEMBER, Katherine Polk Failla,
                                Assistant United States Attorneys, for
                                Preet Bharara, United States Attorney
                                for the Southern District of New York,
                                New York, NY, for Appellee.

                                HERALD PRICE FAHRINGER, Fahringer &
                                Dubno, New York, NY (Jill R. Shellow,
                                Law Offices of Jill R. Shellow, New
                                York, NY; Robert J. Boyle, Law Offices
                                of Robert J. Boyle, New York, NY, on the
                                brief), for Appellant.

SACK, Circuit Judge:

Appellant Lynne Stewart appeals from a judgment of the United States District Court for the Southern District of New York (John G. Koeltl, Judge) sentencing her principally to 120 months' imprisonment following our vacatur on grounds of procedural error of her previous sentence of 28 months and remand of the district court's previous judgment insofar as it imposed that sentence. The details of this case were recounted at length in our prior opinion, United States v. Stewart, 590 F.3d 93, 100-

08 (2d Cir. 2009) ("Stewart I").  We repeat them here only insofar as we think it necessary to explain our judgment.

**BACKGROUND**

In October 1995, Sheikh Omar Ahmad Ali Abdel Rahman ("Abdel Rahman") was convicted in the United States District Court for the Southern District of New York of a variety of crimes including "soliciting the murder of Egyptian President Hosni Mubarak while he was visiting New York City; attacking American military installations; conspiring to murder President Mubarak; conspiring to bomb the World Trade Center in 1993, which succeeded; conspiring subsequently to bomb various structures in New York City, including bridges, tunnels, and the federal building containing the New York office of the Federal Bureau of Investigation . . . , which did not succeed; and conspiring to commit crimes of sedition."  Id. at 101.  His conviction was affirmed by this Court in 1999, United States v. Rahman, 189 F.3d 88, 104 (2d Cir. 1999) (per curiam), and his petition for a writ of certiorari was denied by the United States Supreme Court the following year, United States v. Rahman, 528 U.S. 1094 (2000).

Stewart had been a member of Abdel Rahman's legal team during his trial and his appeal.  Her conviction stemmed from her repeated violations of the "Special Administrative Measures," or "SAMs," to which she agreed to be, and was, subject as a member of Abdel Rahman's legal team while he was incarcerated after his

3

conviction had become final.  Stewart executed various affirmations, under penalty of perjury, in which she agreed to abide by the terms of the SAMs, among them that she would not "use [her] meetings, correspondence or phone calls with Abdel Rahman to pass messages between third parties (including, but not limited to, the media) and Abdel Rahman."  Stewart I, 590 F.3d at 103 (alteration in original; internal quotation marks omitted).[1]

---

[1] 
On May 1, 1998, [Stewart] signed a document entitled "Attorney Affirmation," in which she affirmed, under penalty of perjury, the truth of specified statements regarding the then-applicable SAMs: that she had read the May 11, 1998, version of the SAMs; that she "underst[ood] the restrictions contained in that document and agree[d] to abide by its terms"; that during her visits to Abdel Rahman she would "employ only cleared translators/interpreters and [would] not leave [any] translator/interpreter alone with inmate Abdel Rahman"; and that she would "only be accompanied by translators for the purpose of communicating with inmate Abdel Rahman concerning legal matters."  Stewart also affirmed that neither she nor any member of her office would "forward any mail received from inmate Abdel Rahman to a third person" nor would she "use [her] meetings, correspondence or phone calls with Abdel Rahman to pass messages between third parties (including, but not limited to, the media) and Abdel Rahman."  On May 16, 2000, and again on May 7, 2001, Stewart signed similar affirmations under penalty of perjury, again affirming that she had read the most recent versions of the SAMs, and that she would not use her contact with Abdel Rahman to pass messages between him and third parties, including members of the media.

Stewart I, 590 F.3d at 102-03 (alterations in original; citations

4

Despite and contrary to those obligations, Stewart smuggled messages to and from the incarcerated Abdel Rahman, while purportedly acting in her capacity as his lawyer.[2]  See id. at 105-08.  Most of the messages related to the continuance of a ceasefire that an Egyptian militant group, al-Gama'a,[3] had declared with regard to its violent efforts to overthrow the Egyptian government.  The group sought Abdel Rahman's advice on whether to continue the ceasefire.  See id.

On May 19 and 20, 2000, Stewart visited Abdel Rahman in the Rochester facility.  There he dictated several messages to Stewart's translator and co-defendant, Mohammed Yousry, including "a letter to an al-Gama'a lawyer who favored the cease-fire, asking him to allow others in al-Gama'a to criticize it, and another to [a leader of the group] asking him to 'escalate the language' of criticism of the cease-fire."  Id. at 106.  Stewart smuggled these messages out of the prison.  Id. at 107.

On June 13, 2000, Stewart spoke to a Cairo-based Reuters reporter, telling him that Abdel Rahman "is withdrawing

omitted).

[2]  Abdel Rahman was at all times relevant to the present proceedings incarcerated under heavy security in the Federal Medical Center in Rochester, Minnesota.

[3]  "In November 1997, . . . a group associated with al-Gama'a attacked, killed, and mutilated the bodies of more than sixty tourists, guides, and guards at the Hatshepsut Temple in Luxor, Egypt."  Stewart I, 590 F.3d at 103.

his support for the ceasefire that currently exists." Id. (internal quotation marks omitted). On June 20, 2000, after participating in a conference call with Abdel Rahman, Stewart sent a fax to the Reuters reporter reaffirming Abdel Rahman's previous statement withdrawing his support for the ceasefire. Id.

On April 8, 2002, Stewart was indicted for her actions related to Abdel Rahman's communications to and from prison. A superseding indictment was filed on November 19, 2003. Id. at 108. On February 10, 2005, following a jury trial, Stewart was convicted of conspiring to defraud the United States in violation of 18 U.S.C. § 371 by violating SAMs imposed upon Abdel Rahman to which she had agreed to be bound; providing and concealing material support to a conspiracy to kill and kidnap persons in a foreign country, in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2; conspiracy to provide and conceal such support, in violation of 18 U.S.C. § 371; and making false statements in violation of 18 U.S.C. § 1001. Id.

Stewart appealed from the judgment of conviction; the government cross-appealed as to her sentence. We affirmed the judgment in all respects, except insofar as we concluded that the district court had committed procedural error in the course of Stewart's sentencing. We remanded for her resentencing. Id. at

6

151-52.[4]  We instructed the district court to determine whether Stewart had committed perjury during her trial, which might warrant a sentencing enhancement for obstruction of justice pursuant to the United States Sentencing Guidelines ("Guidelines").  Id. at 151.  We also directed the court to "consider whether Stewart's conduct as a lawyer triggers the special-skill/abuse-of-trust enhancement under the Guidelines." Id.

We further noted a lack of clarity in the record as to whether the district court had actually applied the terrorism enhancement in its Guidelines calculation.  We observed, however, that "in light of the facts of this case and the judgments of conviction . . . , [it] plainly applies."  Id. at 150.

"Finally, [we directed that] the district court . . . further consider the overall question whether the sentence to be given is appropriate in view of the magnitude of the offense . . . ."  Id. at 151.  While we did not preclude the imposition of a non-Guidelines sentence, "we [did] require that such a sentence, selected after the reconsideration we [had]

---

[4]  Stewart's co-defendants Sattar and Yousry were convicted of related crimes.  Although we found no procedural or substantive error in connection with their sentencing, we nonetheless remanded their cases too in order to provide the district court with the freedom to change their sentences in connection with the resentencing of Stewart.  Stewart I, 590 F.3d at 151-52.  The district court decided not to alter their sentences.  Neither their convictions nor their sentences are at issue on this appeal.

directed, begin with the terrorism enhancement and take that enhancement into account."  Id.

We noted our "serious doubts that the sentence given was reasonable" in light of our view of the seriousness of the crimes.  Id.  But we elected to allow for resentencing before reaching the question of substantive reasonableness.  Id.

After remand, on July 15, 2010, the district court resentenced Stewart.  It explicitly applied the terrorism enhancement, explaining that Stewart's actions were "calculated to affect the conduct of the Egyptian government through intimidation and coercion," and that the jury had found that Stewart "possessed the specific intent to provide Abdel Rahman as a coconspirator in a conspiracy to kill."  Tr. of Sentencing Hearing in United States v. Stewart, No. 02 CR 395(JGK) (S.D.N.Y. July 15, 2010) ("Stewart II"), at 41-42.

The court then concluded that the obstruction-of-justice enhancement applied because "[t]he defendant [had] made a series of statements at trial that were clearly false concerning a material matter that were made with the willful intent to provide false testimony."  Id. at 45-52.  The court also determined that the abuse-of-trust enhancement was applicable inasmuch as Stewart "was able to participate in smuggling messages into and out of the prison because of the trust placed in her as the attorney for Sheikh Rahman."  Id. at 53.  Taking

8

these enhancements into account, the court determined that Stewart's Guidelines sentence was 360 months, which was also the statutory maximum.

After evaluating the applicability of the terrorism enhancement, the perjury it found that Stewart had committed, the abuse of trust it found she had engaged in, and statements she made indicating, in the view of the district court, a lack of remorse on her part, and suggesting that she regarded her previous sentence as trivial, and then balancing those factors against significant mitigating factors, the court concluded that a non-Guidelines sentence of 120 months -- one-third of the Guidelines sentence -- was "sufficient but no greater than necessary" to meet the sentencing objectives of section 3553(a). Id. at 73.

Stewart appeals from the imposition of that sentence, arguing primarily that the district court's consideration of her post-sentencing statements violated her First Amendment right to freedom of speech, and additionally that the court erred in applying the obstruction-of-justice and abuse-of-trust enhancements. Stewart also argues that the 120-month sentence is substantively unreasonable.

We disagree in each respect, and therefore affirm.

**DISCUSSION**

**I.  Standard of Review**

We review the district court's application of the Guidelines <u>de novo</u> and its factual findings for clear error. <u>United States v. Watkins</u>, 667 F.3d 254, 261 (2d Cir. 2012).  The district court commits procedural error in sentencing if, for example, it fails to calculate the Guidelines range, incorrectly calculates the Guidelines range, does not properly consider the factors set forth in 18 U.S.C. § 3553(a), or makes factual findings that we conclude are clearly erroneous.  <u>Id.</u>

When reviewing for the substantive reasonableness of a sentence of imprisonment, we examine "the length of the sentence imposed."  <u>Id.</u> (alteration omitted).  We will reverse it on the basis of its magnitude only when the sentencing decision "cannot be located within the range of permissible decisions."  <u>Id.</u> (internal quotation marks omitted).

**II.  "Punishment of Stewart" for Her Public Statements as a Violation of Her First Amendment Rights**

Stewart's principal argument on appeal is that her statements to the public and the press subsequent to her initial sentencing were impermissible bases for more than quadrupling her sentence upon remand.  On resentencing, the district court explicitly considered two statements that Stewart made after the

imposition of her original sentence.[5] She urges that such an increase based on the contents of her protected speech "strikes at the heart of the First Amendment and is constitutionally intolerable." Def.'s Br. at 53.

Stewart made the first statement at issue in front of the courthouse on October 16, 2006, immediately after she was originally sentenced to 28 months in prison. Stewart II, at 61; J.A. 336a. As widely reported (and occasionally misreported), see Stewart I, 590 F.3d at 108 n.9, she said, in part, "Any regrets? I don't think anybody would say that going to jail for two years is something you look forward to, but as my clients

_____

[5] "[T]he district court [is] required to resentence [a defendant] in light of the circumstances as they [stand] at the time of [her] resentencing." Werber v. United States, 149 F.3d 172, 178 (2d Cir. 1998); see also United States v. Bryce, 287 F.3d 249, 257 (2d Cir. 2002) ("A sentencing authority may justify an increased sentence by affirmatively identifying relevant conduct or events that occurred subsequent to the original sentencing proceeding." (internal quotation marks, alterations, and emphasis omitted)). This principle applies to mitigating considerations with equal force as it applies to aggravating ones. See Pepper v. United States, 131 S. Ct. 1229, 1241 (2011) ("In light of the federal sentencing framework described above, we think it clear that when a defendant's sentence has been set aside on appeal and his case remanded for resentencing, a district court may consider evidence of a defendant's rehabilitation since his prior sentencing and that such evidence may, in appropriate cases, support a downward variance from the advisory Guidelines range.").

11

have said to me, 'I can do that standing on my head.'"[6]  J.A. 336a.

During her resentencing proceedings, Stewart characterized these remarks as "intemperate at best," but contended that they were taken out of context -- they were meant to indicate only that she was relieved at being given a sentence that was such a small fraction of her Guidelines sentence. Stewart II, at 61.  But the district court understood them to "indicate[] that the defendant did indeed view the sentence as a trivial sentence." Id.  Referring to the language of 18 U.S.C. § 3553(a)(2)(A), the court explained that a sentence viewed as trivial "would not be sufficient to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense as required by law."  Id.

Stewart made the second statement during a November 18, 2009, television interview.  She was asked: "[W]ould you do anything differently back then, if you knew what you knew today?" She responded:

> I think I should have been a little more
> savvy that the government would come after
> me.  But do anything differently? I don't --
> I'd like to think I would not do anything
> differently . . . .  I made these decisions
> based on my understanding of what the client
> needed, what a lawyer was expected to do.

---

[6]  A video recording of the statement is available at http://www.youtube.com/watch?v=jVfQyfXsYmY at 4:31 (last visited June 26, 2012).

They say you can't distinguish zeal from criminal intent sometimes.  I had no criminal intent whatsoever.  This was a considered decision based on the needs of the client.  And although some people have said press releases aren't client needs, I think keeping a person alive when they are in prison, held under the conditions which we now know to be torture[,] . . . totally held without any contact with the outside world except a phone call once a month to his family and to his lawyers, I think it was necessary.  <u>I would do it again.  I might handle it a little differently, but I would do it again.</u>[7]

J.A. 340-41 (emphasis added).

At her subsequent resentencing, Stewart explained that when she said she would "do it again," "'it' has always been about representing my clients with selfless . . . compassion, putting their needs before my own. . . .  Would I do it again?  When the 'it' means compassionately represent my client, the answer is, I would."  <u>Stewart II</u>, at 12-13.  The district court concluded that her statement "indicate[d] a lack of remorse for conduct that was both illegal and potentially lethal," and supported a finding "that the original sentence was not sufficient to accomplish the purposes of section 3553(a)(2), including to reflect the seriousness of the offense and to provide adequate deterrence."[8]  <u>Stewart II</u>, at 62.

---

[7]  A video recording and transcript of the statement are available at <u>http://www.democracynow.org/2009/11/18/exclusive civil rights att orney lynne stewart</u> at 24:33 (last visited June 26, 2012).

[8]  Stewart also points to an interview she gave to George Packer of <u>The New York Times</u>, which was referenced in the

Stewart argues that by taking these statements into account in imposing her sentence, the district court violated her constitutional right to freedom of speech.  Cobbling together scraps of First Amendment doctrine and dicta for support, she contends that she was punished for what she said, and that such punishment runs afoul of the First Amendment.  She asserts that the district court's taking these statements into account for that purpose will have a "chilling effect" on future public statements on matters of public interest by others, and was therefore unconstitutional.  She also urges us to adopt a rule that would prohibit the district court from construing ambiguous public statements on matters of public concern against a defendant when sentencing her.

A.  Constitutionality of the District Court's
    Use of Stewart Statements in Sentencing

Stewart asserts that the First Amendment forbade the district court from using her public statements on public issues as a basis for punishing her.  She refers to the court's actions as, in substance, punishment for her protected speech, which is generally forbidden by the First Amendment.  But Stewart was not punished for violating a governmental restriction on speech.  The

---

government's pre-sentencing submission.  She alleges that this interview was used "to inflame the sentencing judge."  Def.'s Br. at 65.  The district court made no reference to this interview at sentencing.  There is no indication in the record of proceedings in the district court that the court relied on it in resentencing Stewart, or was otherwise "inflame[d]" by its contents.

district court did not treat her speech as a violation of any law -- it considered the content of that speech to be helpful in enabling the court to craft a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth" elsewhere in the statute.  18 U.S.C. § 3553(a).  These "purposes" include "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Id. at § 3553(a)(2)(a).  She was punished, in light of that assessment, not for unlawful speech, but for her crimes of conviction: conspiracy to defraud the United States; conspiracy to provide and to conceal the provision of material support to a conspiracy to kill and kidnap persons in a foreign country; providing and concealing the provision of material support to a conspiracy to kill and kidnap persons in a foreign country; and making false statements to agencies of the United States.[9]

We begin with several principles that are well-settled or, we think, self-evident.  First, a district court is <u>required</u> to sentence a convicted defendant based in part on his or her "history and personal characteristics."  <u>See</u> <u>United States v. Perez-Frias</u>, 636 F.3d 39, 43 (2d Cir. 2011).  Second, a person's history and personal characteristics can often be assessed by a

---

[9]    A rough analogy to a person who confesses to murder may be apt.  That person may be punished for murder as a result of the contents of her truthful statement that she killed someone, but that is not punishment for the statement itself.

15

sentencing court only or principally through analysis of what that person has said -- in public, in private, or before the court. But, third, the First Amendment generally assures citizens "the freedom of speech" from encroachments by federal or state government.

There is an apparent tension between the first and second principles, on the one hand, and the third principle on the other. It lies at the heart of the First Amendment argument made by Stewart here. For where, as here, a district court seeks to assess a convicted defendant's history and personal characteristics through consideration of his or her speech and sentences in part based on the content of that speech, the court may be portrayed as trenching upon the defendant's constitutionally guaranteed fundamental right to speak her mind on public questions.

We conclude, though, that irrespective of any such limitation on Stewart's ability to speak as she wished, her First Amendment rights were not abridged. The sentencing judge was determining the characteristics of the defendant, which were legally relevant to a determination of the appropriate sentence to impose on Stewart, through the contents of statements she voluntarily and publicly made. "The First Amendment 'does not erect a per se barrier' to the admission at sentencing of evidence regarding the defendant's [otherwise protected beliefs,

16

association, or speech].  A sentencing court may consider such evidence so long as it is 'relevant to the issues involved' in the sentencing proceeding."  United States v. Kane, 452 F.3d 140, 142 (2d Cir. 2006) (per curiam) (quoting Dawson v. Delaware, 503 U.S. 159, 164-65 (1992)).[10]  The district court's reading of 18 U.S.C. § 3553(a)'s broad constellation of factors to be assessed in the course of imposing sentence as permitting review of the defendant's public statements indicating that she considered her sentence to be trivial, or exhibiting a lack of remorse, does not violate her right to speak under First Amendment principles as we understand them.[11]

_____

[10]  Although each court to have addressed this issue frames the "test" in a somewhat different manner, the touchstone is "relevance."  See, e.g., United States v. Simkanin, 420 F.3d 397, 417-18 (5th Cir. 2005) ("Simkanin's beliefs and associations may be considered if they were sufficiently related to the issues at sentencing." (internal quotation marks omitted)); Kapadia v. Tally, 229 F.3d 641, 648 (7th Cir. 2000) ("Nothing in the Constitution prevents the sentencing court from factoring a defendant's statements into sentencing when those statements are relevant to the crime or to legitimate sentencing considerations."); United States v. Curtin, 489 F.3d 935, 953-54 (9th Cir. 2007) (en banc) ("[T]he Supreme Court has held on many occasions in other contexts that opinions and other information that otherwise might be entitled to First Amendment protection are not immune from discovery and use as evidence in court, as long as they are relevant to an issue in a given case.").

[11]  Sentences are not governmental regulations.  The case law does not require courts to scrutinize them, as they ordinarily would statutory or regulatory restraints on speech, to ensure that any incursion on the freedom to speak is "narrowly tailored" to address a specific, articulable, and compelling governmental interest.  See Brown v. Entm't Merchs. Ass'n, 131 S. Ct. 2729, 2738 (2011); see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 131 S. Ct. 2806, 2817 (2011) ("[S]trict

17

In <u>Kane</u> we addressed an argument similar to Stewart's. There, the defendant claimed that the sentencing court violated the First Amendment by "weighing [the defendant's] prior published writings against the mitigating character evidence he offered at sentencing." 452 F.3d at 141. Kane had pled guilty to a scheme to defraud the Federal Housing Administration and Department of Housing and Urban Development. In support of his request for a probationary sentence, Kane submitted letters testifying to his good character. The government, in response, submitted excerpts of books Kane had written that explained, among other things, how to manipulate financial records in order to receive housing subsidies. <u>Id.</u> at 142.

We observed:

> [Although] the government may not offer proof of a defendant's abstract beliefs merely for the purpose of demonstrating that those beliefs, and by extension the defendant, are morally reprehensible . . . [h]ere, the District Court considered Kane's writings only to the extent that they rebutted his

---

scrutiny . . . requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." (internal quotation marks omitted)).

We need not decide whether strict, intermediate, or some other level of scrutiny would apply if Stewart were challenging a government regulation here. "Deciding whether a particular regulation is content based or content neutral is not always a simple task. . . . As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." <u>Turner Broadcasting Sys., Inc. v. FCC</u>, 512 U.S. 622, 642-643 (1994).

18

> mitigating evidence.  The First Amendment
> does not bar the government from putting the
> lie to a defendant's proof at sentencing.

Id. at 143 (internal quotation marks omitted).  "[B]ecause much of Kane's writings concerned illegal real estate schemes, which related directly to his offense of conviction, the writings also may indicate the increased likelihood of recidivism or a lack of recognition of the gravity of the wrong."  Id. (internal quotation marks omitted).

In United States v. Bangert, 645 F.2d 1297 (8th Cir. 1981), the circuit court examined the sentences of two individuals who had been convicted of theft and destruction of government property for stealing a United States flag from a flagpole on a federal building and later burning it "to protest involvement of the United States in the internal affairs of Iran."  Id. at 1300.  Both defendants received the maximum sentence -- one year's imprisonment and a $1,000 fine.  Id. at 1306.

The court explained that "[c]onsideration of political beliefs, as distinguished from criminal activity, would clearly be impermissible in determining defendants' sentences, because it would impair the rights of the defendants under the First Amendment, protecting public expression of their political beliefs, by words and symbols."  Id. at 1308.  In that case, however, the district court was explicit:

19

> [The defendants'] sentence . . . has nothing to do with [their] political beliefs or [their] membership in whatever organizations [they] belong to or the fact that [they] were expressing [them]selves in a peaceful demonstration[.] And [they] are surely not being sentenced because of [one of the defendant's], at least, feeling about the Vietnam War, because certainly any thinking person, from time to time, has doubts about actions that may have been taken.

Id. The circuit court concluded that the district court had not rested its sentencing decision on the defendants' speech, but instead upon the defendants' "lack of truthfulness and lack of remorse." Id. (emphasis added).[12]

---

[12] Courts have also denied challenges akin to Stewart's, based on a court taking into account statements (albeit ones made in court) questioning the illegality of the crimes of conviction. See Simkanin, 420 F.3d at 417-18 (concluding that it was proper to consider in sentencing the defendant's "specific beliefs that the tax laws are invalid and do not require him to withhold taxes or file returns (and his association with an organization that endorses the view that free persons are not required to pay income taxes on their wages) [because they are] directly related to the crimes in question and demonstrate a likelihood of recidivism"); see also United States v. Bone, 433 F. App'x 831, 835 (11th Cir. 2011) (rejecting challenge to the denial of a downward variance when defendant filed a "notice and declaration of certificate of sovereign status" and asked for immediate release where the district court "reasoned that the statements were evidence of Bone's refusal to accept responsibility for his acts, his unpreparedness to return to society, the danger to himself and to others of returning him to society, and his lack of respect for the law. These points are proper sentencing considerations . . . ."); United States v. Smith, 424 F.3d 992, 1016 (9th Cir. 2005) (rejecting a defendant's arguments that the First Amendment prevented the court from considering in sentencing his diatribe on the court's "lack of jurisdiction" and contesting the existence of the United States because "the district court made it clear that it was increasing the sentence based on [the defendant's] lack of remorse [which is a] legitimate sentencing factor[]").

In United States v. Lemon, 723 F.2d 922 (D.C. Cir. 1983), relied upon by Stewart, the Court of Appeals for the D.C. Circuit explained, in a manner echoed by the views we later expressed in Kane and United States v. Fell, 531 F.3d 197 (2d Cir. 2008), that "a court may not punish an individual by imposing a heavier sentence for the exercise of first amendment rights. . . . A sentence based to any degree on activity or beliefs protected by the first amendment is constitutionally invalid." Lemon, 723 F.2d at 937-38.[13]

The court overturned the defendant's sentence because the prosecution did "little more than . . . attempt to establish guilt by association through an accumulation of uncorroborated suspicions. It [did] not appear from the record that the government [was able to] demonstrate a single direct link between the defendant and illegal activity by known members of [the

_____

[13] The Lemon court considered the role a defendant's association with a group called the Black Hebrews could play in sentencing. All parties agreed that the Black Hebrews was a religious organization, but the government argued that the group was also involved in illegal activities, and therefore the defendant could be punished for assisting the group in furthering those activities. The court concluded that "the first amendment proscribes punishment of an individual for membership in a protected organization unless the organization has illegal aims and the individual intends to further those aims." Id. at 939-40. "[M]ere membership would be an impermissible factor in sentencing. . . . [T]here must be sufficiently reliable evidence of the defendant's connection to illegal activity within the Black Hebrews to insure that he is not being given a harsher sentence for mere association with the group and its legitimate aims and activities." Id.

21

organization of which the defendant was a member]."  <u>Id.</u> at 941.

The court thus identified a First Amendment violation.  But it explicitly acknowledged (albeit necessarily in dicta) that the defendant's otherwise protected association could have been considered in sentencing if that association was specifically tied to illegal aims.  In other words, the district court was not barred from considering what it might have otherwise legitimately considered -- the defendant's support for illegal activity -- solely because that support might have been related to beliefs or association otherwise protected by the First Amendment.

We again emphasize the complete bar on the use of protected speech, belief, or association at sentencing for the purpose of punishment based on the feature that warrants its First Amendment protection.  It is impermissible to sentence a defendant more harshly based on associations that do not relate to specific criminal wrongdoing, for example, or for beliefs that some might find morally reprehensible, or for critical statements made in public because they were made in public.[14]  While "[t]he

_____

[14]  The "rule" set out here turns on a factual inquiry into the purposes for which what might be considered protected speech or conduct is used at sentencing.  But such ad hoc inquiries are not uncommon when dealing with discretionary action in the First Amendment context.  <u>See, e.g.</u>, <u>FCC v. Pacifica Found.</u>, 438 U.S. 726, 746 (1978) ("If there were any reason to believe that the Commission's characterization of the Carlin monologue as offensive could be traced to its political content -- or even to the fact that it satirized contemporary attitudes about four-letter words -- First Amendment protection might be required.  But that is simply not this case.").

22

First Amendment forbids the uncabined reliance on a defendant's 'abstract beliefs' at sentencing . . . the government may introduce evidence of beliefs or associational activities, so long as they are relevant to prove [permissible sentencing factors, such as] motive or aggravating circumstances, to illustrate future dangerousness, or to rebut mitigating evidence." Fell, 531 F.3d at 228; see also United States v. Brown, 479 F.2d 1170, 1174 (2d Cir. 1973) ("[B]as[ing] [a] sentence on . . . revulsion arising out of [a defendant's] social or political views . . . would be improper."); Bangert, 645 F.2d at 1308 (similar).[15]

Stewart does indeed argue that she was prosecuted and punished for her political beliefs. The most obvious -- and fatal -- shortcoming in Stewart's argument in the context of this appeal is that there is not a hint in the record of any fact to support an assertion that the district court did so. And we are, parenthetically, at a loss to understand why Stewart thinks that the district judge's views of her politics changed drastically

---

[15] An extreme version of Stewart's argument was made by the defendant in United States v. Tapanes, 284 F. App'x 617 (11th Cir. 2008). There, the defendant, during the course of a boat chase, made an obscene gesture directed to the United States Coast Guard officials in pursuit. Over a First Amendment objection, the court found no error in considering the gesture in sentencing because it "was relevant to [the defendant's] sentencing [as it] reflected upon [the defendant's] history and characteristics, and, specifically, [his] lack of respect for the law . . . ." Id. at 621.

for the worse between 2006, when he gave her a sentence so light compared with her Guidelines sentence that she expressed her profound relief (as reflected in her public "I can do that standing on my head" comment), and 2010, when the court imposed the higher sentence, still one-third of the Guidelines minimum, of which she now complains. The court was properly concerned about whether she considered her previous sentence to have been "trivial," and whether she had remorse for her acts adjudged to be serious crimes, not about any political views of hers that may or may not have played a part in her commission of the crime or her reaction to her conviction and sentence.

Finally, underlying Stewart's argument is the suggestion that her sentence was set at a higher level principally because of her public statements. The significance of that assertion is questionable -- it is not clear why a considerable increase in sentence based entirely on the defendant's lack of remorse and her consideration of a lower sentence as "trivial" would be improper. But in any event, the suggestion is false. In Stewart I, we remanded with the explicit direction that the district court would apply the terrorism enhancement, determine whether the abuse-of-trust and obstruction-of-justice enhancements applied, and "consider the overall question whether the sentence to be given is appropriate in view of the magnitude of the offense." Stewart I, 590 F.3d at

24

151.  The district court was permitted to consider Stewart's lack of remorse and view of the seriousness of her previous sentence in arriving at an appropriate new sentence pursuant to section 3553(a), as we have explained, but the increase in her sentence was based on consideration of myriad other factors not properly or fully addressed at her previous sentencing.  Of the 42 pages of transcript containing the district court's resentencing and its statements of the reasons therefor, barely more than a page, Stewart II at 61-62, is devoted to a discussion of the speech at issue here and its consequences for sentencing purposes.

B.   The "Chilling Effect"

Stewart argues that her statements at issue were on matters of "public concern," Def.'s Br. at 58 & n.15, and "speech on matters of public concern is at the heart of the First Amendment's protection."  Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011) (internal quotation marks and alterations omitted).  Because of the public's interest in defendants speaking out in the manner in which Stewart did, the Court should be wary of stifling similar speech, which, she argues, would be the result of allowing the stiffer sentence she received here to stand.  To make this point, she relies upon related First Amendment jurisprudence.  She cites, for example, Hotchner v. Castillo-Puche, 551 F.2d 910 (2d Cir. 1977), a case in which we held that

25

the plaintiff in a defamation and invasion of privacy suit had failed to establish "actual malice," for the assertion that "[a]ny risk that full and vigorous exposition and expression of opinion on matters of public interest may be stifled must be given great weight. In areas of doubt and conflicting considerations, it is thought better to err on the side of free speech." Id. at 913; see also Def.'s Reply Br. at 8-9.[16] And, Stewart asserts, the use of her statements as a basis for increasing her sentence will deter future speech by others. Indeed it is easy to imagine that sometime in the future at least one lawyer will use the story of Stewart's resentencing as an object lesson as to the kind of statements his or her client should avoid making while awaiting sentencing, thus "chilling" that person's speech.

As we have noted, though, if the question before us were permissibility of a statute or other governmental regulation

---

[16] She might better have referred to Justice O'Connor's opinion for the Supreme Court in Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767 (1986). There, the Court concluded that under the First Amendment, plaintiffs must bear the burden of falsity in defamation suits about matters of public interest "[t]o ensure that true speech on matters of public concern is not deterred." Id. at 776. "Because such a 'chilling' effect would be antithetical to the First Amendment's protection of true speech on matters of public concern, we believe that a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant. To do otherwise could only result in a deterrence of speech which the Constitution makes free." Id. at 777 (internal quotation marks omitted).

26

under which Stewart's speech had indeed been punished, "strict scrutiny" might well be applicable, see supra note 11, and the deterrent -- "chilling" -- effect of the restriction might require our careful consideration.  That is not this case, however, and Stewart's repeated cries of "chilling effect" therefore avail her little.[17]

Although employed by courts for more than fifty years,[18] the term "chilling effect" is hardly precise.  It ordinarily seems to refer to the deterrent effect an overbroad statute or government regulation (including the availability of civil cause of a action) may have on speech because the mere possibility that the statute or regulation may be employed against some future protected speech might deter individuals from making such protected statements.  See Dombroski v. Pfister, 380 U.S. 479, 486-87 (1965).  "The chilling effect upon the exercise

---

[17] The analogy to a hypothetical person who confesses to murder, to which we have adverted, may be appropriate.  See supra note 9.  Punishment of such a person for murder may well deter ("chill") future speech in the form of confessions -- public or private -- but it hardly follows that punishment for the murder is a violation of her First Amendment right to speak truthfully about the crime, a matter of undoubted public interest.

[18]  A Lexis search indicates that the term was first employed by the Supreme Court in Times Film Corp. v. City of Chicago, 365 U.S. 43, 74 n.11 (1961) (quoting Paul A. Freund, The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533, 539 (1951)), although the underlying principle seems to have been identified at least as early as Justice Frankfurter's concurring opinion in Wieman v. Updegraff, 344 U.S. 183, 195 (1952) (Frankfurter, J., concurring).

27

of First Amendment rights may derive from the fact of the prosecution [based on such a restriction], unaffected by the prospects of its success or failure." Id. at 487.

Professor Schauer offered a "tentative definition" of the term: "A chilling effect occurs when individuals seeking to engage in activity protected by the first amendment are deterred from so doing by governmental regulation not specifically directed at that protected activity." Frederick Schauer, Fear, Risk and the First Amendment: Unraveling the "Chilling Effect", 58 B.U. L. Rev. 685, 693 (1978) (emphasis omitted). He used as an example "a statute which is directed at hard-core pornography [that] has the actual effect of deterring an individual from publishing the Decameron or Lady Chatterly's Lover." Id.

There is no such "governmental regulation" of speech at issue here,[19] nor is there the prosecution of a civil suit based

_____

[19] Stewart does not argue that she was prosecuted (as opposed to sentenced) for engaging in speech protected by the First Amendment. Nor does she point to anything reasonably resembling a "governmental regulation" that allowed the district court improperly to consider the contents of her public speech. To do that, she would have had to attack section 3553 on the basis that it is unconstitutional because it permits inquiry based on a defendant's public speech of public interest. She has not done so.

This is not to say that no such argument is possible. It has been asserted in the academy that there are First Amendment objections to factoring a defendant's remorse into a sentence at all, under section 3553 or otherwise, even when it is based on in-court statements or failure to make an appropriate such statement. See Carissa Byrne Hessick & F. Andrew Hessick, Recognizing Constitutional Rights at Sentencing, 99 Cal. L. Rev.

28

on such a restriction.  Thus the term "chilling effect" as used descriptively by Stewart does not appear to fall within the meaning of "chilling effect" as it has historically been used by the courts.

It is not the law that any action by an agent of government that has a collateral deterrent effect on protected speech ipso facto violates the First Amendment.  There is no authority for the general proposition that underlies Stewart's argument: that the government cannot use the contents of voluntary public speech to the speaker's disadvantage despite the likelihood that someone will subsequently think twice about making a similar public statement.

_____

47, 66-71 (2011).  But that is not the law of this Circuit -- evidence of lack of remorse is regularly used in imposing sentence.  See Watkins, 667 F.3d at 260;  United States v. Martinucci, 561 F.3d 533, 535 (2d Cir. 2009)  (per curiam); see also United States v. Barresi, 316 F.3d 69, 75 (2d Cir. 2002) (assuming that "lack of remorse" can properly be used as a basis for an upward departure from a Guidelines sentence, but concluding that there was an "absence of any grounds in the record that could persuasively warrant [such a] finding.").  As noted, she has in any event not made this argument.

Neither are we aware of any defendant who has attacked section 3553, successfully or otherwise, on the basis that its chilling effects on speech require First Amendment scrutiny. This is not surprising.  "Nearly all the ways that defendants speak in court are heavily regulated and potentially punishable without raising First Amendment claims."  Alexandra Natapoff, Speechless: The Silencing of Criminal Defendants, 80 N.Y.U. L. Rev. 1449, 1484 (2005).  While Stewart is, of course, challenging the use of her out-of-court statements at sentencing, the court took them into account in the same manner as it would have been entitled to had she expressed the same lack of remorse in testimony or otherwise in court.

29

## C.  The Ambiguity of Stewart's Statements

Stewart makes a related argument to the effect that the district court was forbidden to interpret her statements as it did -- to indicate a lack of remorse and her view that the sentence she received was trivial -- in light of her alternative explanations as to the meaning of those statements.  "[B]ecause of the importance of free speech, Ms. Stewart is certainly entitled to the benefit of the doubt where there are two conflicting views or interpretations of what she said.  Under the First Amendment, any ambiguities must be resolved in favor of sustaining the protected speech."  Def.'s Br. at 75.

Assuming the statements were ambiguous -- a questionable proposition, especially with regard to the meaning of the statement "I would do it again" -- we know of no law or legal principle to support a conclusion that the district court was not permitted to use its informed best judgment in determining whether the speech in question disclosed that Stewart considered a 28-month sentence "trivial," or demonstrated a lack of remorse for the crimes she committed -- clearly a factor that the court was permitted to take into account in sentencing.  See, e.g., Martinucci, 561 F.3d at 535; United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006).[20]

_____

[20]  As we have noted, Stewart does not contend that section 3553 is unconstitutional.  See supra note 19.  Neither does she argue that under the particular circumstances of her sentence,

Wide latitude is afforded to sentencing courts in crafting sentences "sufficient, but not greater than necessary" to achieve the sentencing objectives set forth by Congress. 18 U.S.C. § 3553(a); see 18 U.S.C. § 3553(a)(2)(A)-(B) ("[The district court] shall consider the need for the sentence imposed

---

lack of remorse should not be a factor because it usually relates to concerns about recidivism and rehabilitation, neither of which may be seriously at issue in her case in light of her age and disbarment, as the district court noted. Stewart II, at 65, 68. Instead she asserts that the statement in question does not evidence lack of remorse. See Def.'s Br. at 73-75; Stewart II, at 12-13.

The district court's view was that "[t]hese statements indicate that the original sentence was not sufficient to accomplish the purposes of section 3553(a)(2), including to reflect the seriousness of the offense and to provide adequate deterrence." Stewart II, at 62. The court was apparently referring to general deterrence, in light of its remarks regarding the very limited potential for recidivism on Stewart's part. We think that these reasons were sufficient and proper. See Fernandez, 443 F.3d at 33 ("Section 3553(a)(1) . . . is worded broadly, and it contains no express limitations as to what 'history and characteristics of the defendant' are relevant.").

To be sure, there is room for debate on the function that consideration of remorse serves when recidivism or rehabilitation are not at issue, or if it is effective in addressing those goals. Compare Bryan H. Ward, Sentencing without Remorse, 38 Loy. U. Chi. L.J. 131, 140 (2006) ("[C]ourts rely on remorse simply because, historically, courts always have."), with Stephanos Bibas & Richard A. Bierschbach, Integrating Remorse and Apology into Criminal Procedure, 114 Yale L.J. 85, 125 (2004) ("The values served by remorse and apology should be more integral parts of the process of prosecution and punishment. For the criminal law to regulate society effectively and morally educate, it must serve the values of remorse and apology in addition to deterring crimes, inflicting retribution, and protecting defendants' rights."). Inasmuch as the issue has not been raised on this appeal, we have no cause to engage in that debate.

31

to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense [and] afford adequate deterrence to criminal conduct."). And "[n]o limitation [is permitted] on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

The district court acknowledged this latitude in rejecting Stewart's argument that the First Amendment barred consideration of her post-sentencing statements. "[T]he Court can take into account, for purposes of sentencing, the truth of the defendant's comments about the sentence and the degree of her remorse in the way that courts allow defendants to speak at sentencing and consider those statements." Stewart II, at 62. Were we to read the Constitution to prohibit the consideration of a defendant's statements solely because they were only arguably unfavorable to the defendant's position, as Stewart urges, we would take away from the district court the ability fully to assess facts bearing on the defendant's state of mind in accordance with the requirements of section 3553, which enables the court to impose a sentence fair to both the defendant and society. We have been given no sound reason to do so.

### III. Obstruction-of-Justice Enhancement

Stewart also argues that the district court erred in applying the obstruction-of-justice enhancement. The Guidelines allow for such a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. In order to impose the enhancement, "a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." United States v. Zagari, 111 F.3d 307, 329 (2d Cir. 1997). "A witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993).

The district court must find each of the elements to be present by a preponderance of the evidence. See United States v. Salim, 549 F.3d 67, 75 (2d Cir. 2008). The court's findings of fact that, for example, a statement was intentional or false, must be upheld unless clearly erroneous. Id. at 74.

The district court outlined in detail seven statements that it concluded constituted perjury and warranted the obstruction-of-justice enhancement. They fall into three general categories: A) that Stewart believed, notwithstanding the literal language of the SAMs, that she was allowed to take the actions that she did; B) that she did not participate in a conspiracy with her co-defendants; and C) that she did not know the identity of Rifa'i Taha Musa ("Taha"), also known as "Abu Yasir," "a military leader of al-Gama'a, a follower of Abdel Rahman, and an unindicted co-conspirator," Stewart I, 590 F.3d at 103.

A. The SAMs

The first category of statements that the district court concluded were perjurious and warranted the enhancement related to Stewart's "assertion that she believed that she was complying with the SAMs because the attorneys operated in a 'bubble' and that, consequently, she did not violate the SAMs or sign the false affirmation." Stewart II, at 45. Four specific statements supported the district court's finding: "that it was understood by the United States Attorney's Office and Abdel Rahman's attorneys that the SAMs contained a 'bubble' which permitted Abdel Rahman's attorneys to issue press releases containing Abdel Rahman's statements as part of their representation of him"; "that she kept her 'promise to abide by the plain language of the SAMs' and that she did not believe that

34

she violated 'the SAMs or the language of the SAMs'"; "that she did not believe that she violated any 'command' or restriction of the United States of America"; and "that she never signed a false affirmation." Id. at 45-46 (citations to trial transcript omitted).

Stewart contends on appeal that because her issuance of press releases and her making of other statements to the public relaying Abdel Rahman's statements were incidental to her "effective representation" of Abdel Rahman, they were allowed "notwithstanding the language" of the SAMs. Def.'s Br. at 81. She asserts that she did not believe the literal language of the SAMs was binding because her co-counsel Ramsey Clark and Abdeen Jabara were "openly and notoriously" violating the SAMs, and had not been subject to repercussions for their violations. Id. at 81-82. In addition, Stewart contends that her view was buttressed by the fact that, after her 2000 statement to Reuters, the government continued to allow her to visit Abdel Rahman. Id. at 83.

Stewart does not assert that her actions were allowed by the literal language of the SAMs. They were not. She argues instead that at the time she took actions in literal violation of the SAMs, a kind of "estoppel" applied, and that as a result, she could not be prosecuted for taking them. Therefore, she argues,

35

her statements to that effect were not false, and cannot support the obstruction-of-justice enhancement.

As the district court explained, Stewart's actions belied this argument.  She repeatedly exhibited behavior demonstrating that she understood her actions to be in violation of the law and that she could face consequences, including criminal prosecution, as a result of them.  For example, she made "covering noises while the messages were read or responses by Sheikh Rahman were dictated"; during the May 2000 prison visit she and Yousry acknowledged they would be "in trouble" if the guards discovered they were reading messages from Taha to Abdel Rahman, and upon their return for a second visit in May 2000 left a similar message in the car for fear of them being searched and it being discovered; she acknowledged when speaking to Reuters that the statement might cause her to be banned from visiting her client; and she told Yousry she was "risking her whole career" by issuing the press release.  Stewart II, at 46-47.  After receiving a letter from then-Assistant United States Attorney Patrick Fitzgerald informing her that her actions in publicly disclosing Abdel Rahman's withdrawal from the ceasefire were in violation of the SAMs, Stewart signed another affirmation agreeing to abide by them.  In July 2001, she nonetheless again violated the SAMs.  Id. at 48.

In light of these facts, the failure of the government to seek to prosecute Clark and Jabara has little relevance to the question whether Stewart is being punished inappropriately for violation of the SAMs. And some of their actions that Stewart points to, such as Clark's 1997 issuance of a press release expressing Abdel Rahman's support for the ceasefire, took place before the SAMs prohibited such actions. Clark and Jabara did indeed refuse to issue any public statement from Abdel Rahman withdrawing his support for the ceasefire. See Stewart I, 590 F.3d at 105. As the district court explained, "the defendant's actions went further than those of either Messrs. Clark or Jabara by publicizing withdrawal from the ceasefire." Stewart II, at 48.

Finally, the district court concluded that Stewart had testified falsely when she said she had not signed false affirmations pledging to abide by the SAMs. A statement of this type that is inconsistent with a jury's finding, as it was here, can support an obstruction-of-justice enhancement. See United States v. Bonds, 933 F.2d 152, 155 (2d Cir. 1991) (per curiam) (concluding that the jury finding the defendant acted with knowledge contradicted his factual assertion that he had not done so), superseded on other grounds by regulation as recognized in United States v. Castano, 999 F.2d 615, 617 & n.2 (2d Cir. 1993) (per curiam).

The district court considered Stewart's arguments and evidence to the effect that the statements it identified were not false because she genuinely harbored the belief that her conduct was not in violation of the SAMs, even if it was literally prohibited by them. The district court found by a preponderance of the evidence that her statements were false based largely on her contemporaneous statements and actions demonstrating her understanding that she was engaged in illegal activity, and the jury's finding that she acted with knowledge. We see nothing in the record to the contrary. The district court's findings were not "clearly erroneous."

B. Conspiracy

The district court also decided that the obstruction-of-justice enhancement was justified by Stewart's statements "that she did not believe that she 'conspired with anyone to defraud the United States of America, the Department of Justice and the Bureau of Prisons out of its right to have the SAMs applied and enforced,'" and "that she did not 'believe that there was a conspiracy that involved Mr. Sattar or this fellow Taha and others to kill or kidnap people in a foreign country' and did not make 'Abdel Rahman available to any conspiracy to kill or kidnap people.'" Stewart II, at 49. These statements, the district court concluded, "were necessarily inconsistent with the jury's finding of guilt and were false testimony concerning

38

material matters that cannot be ascribed to mistake, inadvertence or faulty memory." Id.

Stewart argues that these statements cannot support an obstruction-of-justice enhancement because they were expressions of opinion as to her guilt or innocence -- before she was in fact found guilty or acquitted of anything. To be sure, an obstruction-of-justice enhancement would have been in error had she done no more than proclaim herself "not guilty." See, e.g., United States v. Scop, 940 F.2d 1004, 1012 (7th Cir. 1991) ("Statements relating to one's own guilt, prior to conviction, are considered statements of opinion and cannot be perjurious."); United States v. Endo, 635 F.2d 321, 323 (4th Cir. 1980) ("[A] [c]onviction for perjury cannot be sustained solely because the defendant gave inconsistent answers to the question, 'are you guilty?' To be false, the statement must be with respect to a fact or facts and the statement must be such that the truth or falsity of it is susceptible of proof." (internal quotation marks and alteration omitted)). Stewart's statements were not, however, limited to a denial of guilt -- they were directly related to specific underlying conduct: She denied knowledge of or participation in the conspiracy. The jury found to the contrary that she knowingly participated in it.

In Bonds, 933 F.2d at 155, we concluded that a defendant who testified that he did not know that money he

39

distributed was counterfeit could be found to have committed perjury based on a subsequent jury conviction for that crime.

> [B]y finding [the defendant] guilty of knowingly distributing counterfeit money, the jury necessarily determined that [he] knew that the money he had distributed was counterfeit -- that is, unless the jury's verdict was unsupported by the evidence, in which case, of course, the remedy would be to reverse [his] conviction, not simply to disallow the two-level upgrade in sentencing.

Id. (emphasis omitted).

Here, as in Bonds, the jury's findings of guilt on Count One, charging conspiracy to defraud the United States, and Counts Four and Five, charging material support of terrorism, each required the jury to find that Stewart's actions were undertaken knowingly. The jury's findings contradicted Stewart's factual testimony to the effect that she did not engage in this conduct, or at least did not do so knowingly. The court's decision on this score was not clearly erroneous.

C. Taha

The district court also concluded that Stewart's testimony that between 1996 and 2000 she did not know the name "Taha," and that during the May 2000 prison visit she did not know who "Abu Yasir" was, supported the obstruction-of-justice enhancement. Stewart II, at 50. In making this finding, the district court noted that Stewart testified that she had seen the name Taha in an article in connection with her representation of

40

another defendant prior to 2000, but had filed the article away and forgotten about it. Id. Stewart acknowledged having arranged before her May 2000 visit to Abdel Rahman for translation of an article explaining that Taha and Abu Yasir were one and the same, and describing Taha's role in the Egyptian Islamic movement. Id. Stewart also acknowledged that Yousry translated all correspondence and documents that would be provided to Abdel Rahman in advance of each visit, as well as after each visit, all correspondence dictated by Abdel Rahman. During the May 2000 visit, Yousry read a statement from Abu Yasir identifying him as a leadership member of the militant group, and describing him as someone with "massive weight" who "the regime worries about" to the extent it worries about anyone. Id. at 51. One newspaper article that Stewart approved for reading to Abdel Rahman contained belligerent statements by Taha and explained who he was; another said that he was also known as Abu Yasir. Stewart also acknowledged having read an article, which she later sent to Sattar and Yousry, that described a videotape made by Osama bin Laden, Ayman al-Zawahiri, and Taha calling for the release of Abdel Rahman. Id.

Based on this evidence, the district court rejected Stewart's assertion that she did not remember who Taha was because she was a "busy lawyer." Id. "[T]he references to Taha were numerous enough and significant enough that her testimony

41

that she had not heard of Taha until the trial" constituted perjury sufficient to warrant the obstruction-of-justice enhancement, as were her statements "that she did not know who Abut Yasir was at the time of the May 2000 prison visit and that the name had no meaning for her." Id. at 51-52.

Stewart argues on appeal that "[n]owhere in the hundreds of hours of recordings or in any of the documents admitted at trial is there any direct evidence that Ms. Stewart knew Taha's connection to [al-Gama'a or] that anyone ever spoke of him and his role in English in Ms. Stewart's presence." Def.'s Br. at 94. She acknowledges that she approved articles for reading to Abdel Rahman, but contends those articles were subject only to her "cursory review," and in some instances were not given her prior approval at all. Def.'s Br. at 95-97. Of course, in applying the enhancement, the "district court [was] entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence." United States v. Khedr, 343 F.3d 96, 102 (2d Cir. 2003).

The district court's conclusion that Stewart must have known who Taha was, and that his alias was Abu Yasir, finds sufficient support in the record. The district court noted the specific instances in which Stewart was known to have approved messages or articles containing information about Taha. It seems unlikely that Stewart was unaware of the existence and identity

42

of a person -- Taha -- who had appeared on a videotape with bin Laden and al-Zawahiri to demand Abdel Rahman's release. Taha was a key figure in the events unfolding in Egypt to which Abdel Rahman was a central player, and Taha was in direct contact with Stewart's co-defendant Ahmed Abdel Sattar. We conclude that the district court's finding by a preponderance of the evidence that Stewart's statements denying knowledge of Taha were false was not clearly erroneous.

## IV. Abuse-of-Trust Enhancement

Stewart objects to the district court's imposition of the abuse-of-trust enhancement, which applies "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The "applicability of a § 3B1.3 enhancement turns on the extent to which the position provides the freedom to commit a difficult-to-detect wrong." United States v. Allen, 201 F.3d 163, 166 (2d Cir. 2000) (internal quotation marks omitted).

In imposing this enhancement, the district court explained that:

> Access to Sheikh Rahman was limited and attorneys were given access for legal purposes. The defendant swore that she would abide by the SAMs and not use her access to pass messages between Sheikh Rahman and the media, but she failed to keep her word. The administration of the SAMs depended on trust placed in attorneys to keep their word. The

43

defendant was able to participate in smuggling messages into and out of the prison because of the trust placed in her as the attorney for Sheikh Rahman. Even after she had violated the SAMs, she was permitted to visit Sheikh Rahman again because she signed a new affirmation. But, again, she did not abide by that affirmation.

. . . Ms. Stewart abused her position as a lawyer to gain access to Sheikh Omar Abdel Rahman while he was in prison and used that access to smuggle messages to and from Sheikh Abdel Rahman while he was in prison and to make potential[ly] . . . lethal public statements on his behalf in violation of the SAMs.

Stewart II, at 53 (internal quotation marks and citation to transcript of original sentencing hearing omitted).

Stewart contends that "any finding that Ms. Stewart 'abused trust' is dependent on whether the government explicitly or implicitly sanctioned the conduct upon which the enhancement is based." Def.'s Br. at 99. Stewart argues, as she did in contesting the obstruction-of-justice enhancement, that because she believed her actions to have been permitted, she did not abuse a position of trust. This argument fails here for the same reason it fails with respect to the obstruction-of-justice enhancement: the ample evidence that Stewart understood her actions to have been in violation of her obligations under the SAMs. Indeed, her attempts to evade detection when engaging in actions violating the SAMs during her visits to Abdel Rahman underscore her understanding that she was permitted to be in a

44

position of close contact with Abdel Rahman solely by virtue of her position of trust as his attorney, and demonstrate her knowing abuse of that trust. Stewart could not have committed the crimes of which she was found guilty had she not been placed in a position of trust.[21]

### V. Substantive Reasonableness

Finally, Stewart argues that her sentence is substantively unreasonable, principally because of the more than fourfold increase from her original sentence of 28 months' incarceration to the currently imposed sentence of 120 months. She asserts that aside from her public statements, "no change in circumstances or information available to the sentencing court . . . supported increasing Ms. Stewart's sentence by this magnitude." Def.'s Br. at 101. She also contends that the district court was not permitted to increase the sentence in response to suggestions that it do so in the dissent from our panel opinion, and in the dissents accompanying the denial of rehearing en banc. Def.'s Br. at 103. And she urges that in light of her personal characteristics, the sentence imposed on

---

[21] The government contends that Stewart's claim on this enhancement is subject to plain error review because she did not object to the enhancement on the same grounds before the district court as she does here. Because Stewart's claim fails under either standard of review, we need not decide which applies in this instance.

45

her was so "shockingly high" as to render it substantively unreasonable.

The substantive unreasonableness standard "provide[s] a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." United States v. Rigas, 583 F.3d 108, 123 (2d Cir. 2009). We will only set aside a district court's sentence on substantive grounds "in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

A. Increase without Justification

Stewart contends that the district court's decision to impose a fourfold increase in her sentence was unsupportable because the second sentence was imposed based on the same set of facts that led to Stewart's vacated 28-month sentence. Indeed, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not . . . impose the higher" sentence. United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006).

Here, however, we previously faulted the district court for its "failure to find particular facts." Stewart I, 590 F.3d

46

at 150-51.  We directed the court to make specific findings with regard to whether Stewart had obstructed justice.  Id.  We also asked that the court explicitly consider application of the abuse-of-trust enhancement, and "reconsider the extent to which Stewart's status as a lawyer affects the appropriate sentence."  Id.  We noted that the terrorism enhancement "plainly applies" and that "[w]hether or not the district court gave appropriate consideration in its section 3553(a) analysis to whether support of terrorism is an aggravating factor in this case . . . may be subject to disagreement."  Id. at 151.  After identifying procedural error on the part of the district court, we instructed the court to "begin with the terrorism enhancement and take that enhancement into account," and to "consider the overall question whether the sentence to be given is appropriate in view of the magnitude of the offense."  Id. at 151.  And we explicitly expressed our "serious doubts that the [original] sentence . . . was [substantively] reasonable."  Id.; see also id. at 149 (referring to "the seriousness of Stewart's crimes and the seemingly modest sentence she received for it").

On remand, the district court punctiliously followed our instructions, and in doing so it arrived at the 120-month sentence it imposed on Stewart.  That it did not calculate the same sentence the first time can be attributed largely to the errors we had identified.  Stewart's contention that there was

47

nothing of significance that had changed between the first and second sentencing sufficient to support the greater sentence ignores this entire sequence of events -- most particularly the intervening decision of this Court.

The district court acted within its discretion in imposing the 120-month sentence after engaging in a careful consideration of the factors upon which we focused in our prior opinion, and the increase is therefore not "unsupportable as a matter of law."  Rigas, 583 F.3d at 123.

B.  Instruction from Non-controlling Opinions

Stewart asserts that the district court's sentence is also unsupportable because it was based on instruction from non-controlling opinions in the preceding appeal, particularly the panel dissent[22] and the opinions accompanying the denial of rehearing en banc.  Stewart notes that Judge Pooler, in her concurrence in the denial of rehearing en banc, suggested that it was "inappropriate for other members of the Court to add their views as to what the district court should do on remand [as the] case may return to this Court on a subsequent appeal."  United

---

[22]  The panel majority in Stewart I, 590 F.3d at 150, explicitly invited the district court, upon remand, to consider the views of the panel dissenter (as well as those of the concurring judge) with respect to the district court's consideration of the lack of actual physical harm resulting from Stewart's crimes in imposing sentence.  We think that that was tantamount to a broader conclusion on our part that the district court could indeed consider the dissenting opinion when resentencing.

48

*States v. Stewart*, 597 F.3d 514, 519 (2d Cir. 2010) (Pooler, J. concurring in denial of rehearing en banc). Stewart argues that because of these non-controlling instructions the district court "concluded that the burden in any successive appeal should be on Ms. Stewart to defend herself and the original sentence, not on the Court." Def.'s Br. at 116.

But counsel conceded at oral argument that no authority supports this argument. And Stewart does not point to anything written by any judge of this Court who was not on the panel that had a demonstrable effect on the district court at resentencing, let alone anything that would warrant vacatur of the sentence. We read the transcript of the sentencing proceeding, as explained previously, to exhibit a close adherence to the instructions of the panel majority, and a sentence imposed in accordance with those instructions. That is exactly what was required of the district court on remand.

C.   "Shockingly High" Sentence

Stewart argues, finally, that the sentence imposed was shockingly high. "Ms. Stewart was 70 years old and in ill-health at the time of the resentencing; 120 months is a life sentence with the realistic possibility she will die in prison. . . . [T]he length of the sentence is 'shockingly high' in light of Ms. Stewart's advanced age [and] fragile health," the lack of prosecution of co-counsel who she asserts engaged in activity

49

similarly violative of the SAMs, and in comparison with the sentences of her co-defendants. Def.'s Br. at 102-03. In imposing sentence, the district court explicitly recognized Stewart's "significant health problems," and recognized that she "did not use the practice of law to earn personal wealth"; rather, "she represented the poor, the disadvantaged and the unpopular, often as a court-appointed lawyer." Stewart II, 68-69; see also Stewart I, 590 F.3d at 147-48 (this panel noting same).

As the district court also recognized in its initial sentencing, however, "[t]here is [at issue] an irreducible core of extraordinarily severe criminal conduct." Id. at 63 (internal quotation marks and citation to transcript of original sentencing hearing omitted). In Stewart I, we too specifically noted "the seriousness of Stewart's crimes and the seemingly modest sentence she received for it." Stewart I, 590 F.3d at 149. The 120-month resulting sentence fell a full twenty years below the minimum Guidelines sentence and statutory maximum. Considering all the appropriate factors, the district court determined that a 120-month sentence would be "sufficient, but no greater than necessary" to fulfill the sentencing objectives required under section 3553(a).

It is the "rare case" in which we will find a sentence substantively unreasonable, and we place "great trust" in a

sentencing court. Rigas, 583 F.3d at 123. In Stewart I, we expressly recognized and were "impressed by the factors that figured in Stewart's modest sentence -- particularly her admirable history of providing, at no little personal cost to herself, proficient legal services in difficult cases to those who could not otherwise afford them." Stewart I, 590 F.3d at 147-48. But, nonetheless, she engaged in severe criminal conduct in aid of a terrorism conspiracy, and she did so by abusing the trust that the government had placed in her as a member of the bar. When confronted with these transgressions, she lied repeatedly under oath.

From the moment she committed the first act for which she was convicted, through her trial, sentencing, and appeals, Stewart has persisted in exhibiting what seems to be a stark inability to understand the seriousness of her crimes, the breadth and depth of the danger in which they placed the lives and safety of unknown innocents, and the extent to which they constituted an abuse of her trust and privilege as a member of the bar. We cannot agree with her that the sentence imposed on her was "shockingly high" so as to warrant a finding of substantive unreasonableness.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

51